Filed 10/23/14

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

MERILOU JENKINS, as Trustee, etc.,

    Plaintiff and Appellant,

v.

CHARLOTTE J. TEEGARDEN et al.,

    Defendants and Respondents.

E059692

(Super.Ct.No. RIP1200120)

**OPINION**

    APPEAL from the Superior Court of Riverside County. Thomas H. Cahraman, Judge. Reversed.

    Michael R. Lawler, Jr. and Harry A. Wallace for Plaintiff and Appellant.

    The Law Office of Kyle A. Patrick and Kyle A. Patrick for Defendants and Respondents.

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV, V, and VI.

1

In 2007, Robert (Bob) Perry quitclaimed a house to defendant Charlotte (Jeanne) Teegarden, who was his friend and one of his caregivers. Teegarden prepared the quitclaim deed. In her deposition, Teegarden admitted that the only consideration that she gave for the quitclaim consisted of one dollar and her friendship. At trial, however, she testified that, pursuant to an oral agreement with Perry, she also gave (1) $100,000, which went into improvements to the house, (2) her $45,000 equity in a different house, and (3) her services.

Plaintiff Merilou Jenkins is Perry's stepdaughter and, since Perry's death, the trustee and beneficiary of his trust. In this proceeding, Jenkins contends that the quitclaim was invalid under Probate Code former section 21350, which, at the time, provided that a "donative transfer" is invalid under specified circumstances, including when the recipient drafted the instrument that effected the transfer. Jenkins also contends that the quitclaim deed was ineffective because it was executed by Perry in his individual capacity instead of as trustee and because it had an erroneous legal description.

The trial court found that the quitclaim was not a donative transfer because Teegarden gave good consideration for it. It then reformed the quitclaim deed so as to fix the mistakes in it regarding the grantor's capacity and the legal description.

Jenkins appeals. She contends, among other things, that the trial court erred by finding that the quitclaim was not a donative transfer.

2

Preliminarily, we will hold that, even though Probate Code former section 21350 et seq. has been repealed and replaced by Probate Code section 21380 et seq., which applies only to instruments executed on or after January 1, 2011, Probate Code former section 21350 et seq. still governs an instrument executed before January 1, 2011.

This brings us to the definition of a "donative transfer" for purposes of Probate Code former section 21350 (as well as current Probate Code section 21380) — a question of first impression. We will hold that a transfer is a donative transfer if it is for inadequate consideration; the mere fact that the recipient gave good consideration, sufficient to support a contract, does not prevent the transfer from being donative.

Finally, we will hold that the evidence demonstrated that the quitclaim was a donative transfer under this definition as a matter of law. Hence, the quitclaim was invalid.

I

FACTUAL BACKGROUND

Around 1956 or 1957, when Jenkins was 13 or 14, her mother Loyce married Robert Perry. Jenkins lived with the Perrys until she was 21 or 22.

The Perrys lived at 16065 Perry Heights Drive in Riverside. They also owned a vacant lot next door at 16025 Perry Heights Drive.

In 2002, the Perrys set up a revocable living trust and transferred the vacant lot to the trust. The trust provided that, after the deaths of both spouses, Jenkins would become the successor trustee and sole beneficiary.

3

Perry and Teegarden first met in 2001, when they both commuted on the same train from the same station. Teegarden lived in Sun City and had a full-time job in Anaheim.

Perry hired Teegarden to do household bookkeeping work for a few hours on weekends. In 2003, after Loyce sustained a knee injury, Teegarden began helping the Perrys out around the house by shopping for groceries, cooking, and cleaning. Teegarden was paid some $7,000 to $15,000 a year for her services. Teegarden also socialized with the Perrys. However, the Perrys also had other caregivers, and Teegarden continued to work full-time.

In 2003, Teegarden's house in Sun City went into foreclosure. Pursuant to an oral agreement with the Perrys, she deeded the house to them and they paid off the mortgage. The amount of the mortgage was $205,000;[1] Teegarden estimated that the market value of the house at the time was $250,000. It was agreed that Teegarden could continue to live in the Sun City house. She would pay rent if she could, but if she could not, she did not have to. Whenever she was able to make the mortgage payments again, she would buy it back from the Perrys for $205,000.

---

[1] Teegarden testified that the amount of the mortgage was either $186,000 or $205,000. The documentary transfer tax on the sale to the Perrys was $225.50, which would mean that the Perrys paid exactly $205,000. (See Rev. & Tax. Code, § 11911, subd. (a) [documentary transfer tax of $0.55 per $500].)

Initially, Jenkins saw or spoke to her mother Loyce and to Perry roughly once every two weeks. Starting in 2004 or 2005, however, Teegarden started telling them falsehoods about Jenkins. For example, Teegarden told them that Jenkins intended to put them both in a home, sell their house, and take all their money. Teegarden also told them that Jenkins had gotten her fired from her job and had sent the police to her home.[2] After that, Jenkins tried to stay in touch with Perry, but he would not return her calls.

In December 2005, Loyce died. Perry did not contact Jenkins, nor did she contact him. Perry's caregivers, including Teegarden, arranged the funeral without consulting Jenkins. Jenkins attended the funeral, but she couldn't get close to Perry because Teegarden's husband was "guard[ing]" him. Thereafter, Jenkins had no relationship with Perry.

In early 2006, Perry and Teegarden orally agreed to build a house on the vacant lot that would belong to Teegarden. Perry would pay a contractor to build the structure itself; Teegarden would pay for everything above and beyond the cost of the contractor. Ultimately, Teegarden put about $100,000 into the house; she paid for flooring, the electrical system, a water main, the propane system, appliances, hardscaping, and fencing.

---

[2] Even though Teegarden was recalled to the stand after this testimony by Jenkins, she was never questioned about it; thus, she never denied making these statements.

5

Meanwhile, at some point, Perry sold the Sun City house. It was agreed that the net proceeds would be "a partial offset to what came out of his pocket to build the house."

When a long-time friend learned that Perry was going to quitclaim the house to Teegarden, he went to Perry and said, "Don't do it." Perry replied, "She deserves it and I like her." At some point, Perry told the same friend that "he was building [the house] so [Teegarden] would have a place to live and look after him."

In January or February 2007, the new house was finished, and Teegarden moved in.

On August 1, 2007, Perry signed a quitclaim deed purporting to transfer the house and lot to Teegarden. Teegarden prepared the deed by filling out the blanks in a preprinted form that she had bought at Staples. She wrote in Perry individually — rather than as trustee of the trust — as the grantor. She wrote in the address and assessor's parcel number of the property, but she did not include a proper legal description. She wrote in consideration of one dollar. After the deed was signed but before it was recorded, someone (Teegarden did not know who) wrote in a short legal description, but it did not accurately describe the property.

The attorney who had drafted Perry's 2002 trust[3] testified that he would have expected Perry to ask him to draft any such deed.

---

[3]     This attorney also represented Jenkins at trial.

At that time, the house was worth approximately $480,000.[4] Its fair rental value was $2,500 a month.

In her deposition, Teegarden admitted that she bought the house from Perry for one dollar and her friendship. At trial, however, she testified that the consideration she gave for the property included the $100,000 that she paid toward improvements, plus her equity in the house in Sun City, plus her continued care.

On August 2, 2007, the quitclaim was recorded. However, due to the errors in the deed, the record title remained in the trust.

There was conflicting evidence with regard to whether, at this point, Perry was mentally and physically able to manage his own affairs.

Teegarden continued to buy groceries, cook, do housekeeping, and do bookkeeping for Perry, and he continued to pay her approximately $10,000 a year for her services. She kept a baby monitor in her house in case he "needed to call out for help." However, she still worked full-time, and Perry still had other caregivers.

In 2011, when Perry was 87, he was killed in a fire that destroyed his house.

---

[4]     Jenkins repeatedly states that the house was worth $600,000. She stipulated, however, that it was worth $480,000.

II

PROCEDURAL BACKGROUND

In 2012, Jenkins filed a petition asserting three causes of action against Teegarden:**5** (1) to void a donative transfer under Probate Code former section 21350; (2) to adjudicate title to or possession of alleged trust property under Probate Code section 850; and (3) for damages for financial elder abuse under Welfare and Institutions Code section 15600 et seq.

Teegarden filed a responsive pleading alleging, among other things, that the quitclaim was for good and valuable consideration.

Jenkins filed a trial brief arguing, among other things, that the quitclaim was ineffective because it had the wrong grantor and the wrong legal description.

Teegarden filed a trial brief asserting for the first time that the petition was barred by the statute of limitations. Jenkins filed a supplemental trial brief asserting that Teegarden had forfeited the statute of limitations by failing to plead it.

Similarly, Teegarden filed a trial brief asserting for the first time that the quitclaim deed should be reformed. Jenkins filed a supplemental trial brief arguing that Teegarden was not entitled to reformation.

---

**5** Teegarden's husband Thomas Baloga was also named as a defendant, because he was allegedly living in the house with Teegarden. As his rights are merely derivative of Teegarden's, we do not discuss them further in this opinion. (See *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 931, fn. 1.)

A third named defendant was dismissed without prejudice before trial.

The trial court bifurcated the issue of whether the quitclaim was a donative transfer. After the first phase of trial, it found that the quitclaim was not a donative transfer.

After the second phase of trial, the trial court issued a statement of decision. In it, it found additional evidence that the quitclaim was not a donative transfer. It also stated: "[Teegarden] failed to plead the remedy of reformation, yet sought that relief at the trial. After careful consideration the court finds no prejudice in this regard. [Jenkins] was well-prepared to deal with the issue . . . . [Jenkins] also filed a supplemental trial brief resisting reformation on the merits." It therefore ordered reformation of the quitclaim, so that it would be effective to convey the property to Teegarden.

The trial court expressly declined to rule on the applicability of the statute of limitations.

The trial court then entered judgment against Jenkins and in favor of Teegarden in accordance with its statement of decision.

III

THE QUITCLAIM WAS A DONATIVE TRANSFER AS A MATTER OF LAW

Jenkins contends that the trial court erred by finding that the quitclaim was not a donative transfer.

9

A.    *Statutory Background.*

1.    *Probate Code former section 21350 et seq.*

In 2007, when the quitclaim was executed, Probate Code former section 21350, as relevant here, provided:

"(a)  Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following:

"(1) The person who drafted the instrument.  [¶]  . . .  [¶]  . . .

"(6) A care custodian of a dependent adult who is the transferor."  (Stats. 2003, ch. 444, § 1.)

Probate Code former section 21351 then provided:

"Section 21350 does not apply if any of the following conditions are met:

"(a) The transferor is related by blood or marriage to, is a cohabitant with, or is the registered domestic partner . . . of the transferee or the person who drafted the instrument. . . .

"(b) The instrument is reviewed by an independent attorney . . . .

"(c) . . . [T]he instrument is approved pursuant to a[] [court] order . . . .

"(d) The court determines, upon clear and convincing evidence, but not based solely upon the testimony of [the person who drafted the instrument], that the transfer was not the product of fraud, menace, duress, or undue influence. . . .

"(e) Subdivision (d) shall apply only to the following instruments:

10

"(1) Any instrument other than one making a transfer to [the person who drafted the instrument].  [¶]  . . .  [¶]  . . .

"(h) The transfer does not exceed the sum of three thousand dollars ($3,000)." (Stats. 2002, ch. 412, § 1.)

Probate Code former section 21355 provided:  "This part shall apply to instruments that become irrevocable on or after September 1, 1993."  (Stats. 1995, ch. 730, § 16.)

We pause to summarize these provisions briefly:  A "donative transfer" above a certain minimum value to an unrelated drafter of the transfer instrument was invalid — even if the transferee could disprove fraud, menace, duress, and undue influence — unless it had been either reviewed by an independent attorney or approved by a court.

2.      *Current Probate Code section 21380 et seq.*

In 2010, Probate Code former section 21350 et seq. was repealed, effective January 1, 2014.  (Prob. Code, former § 23155, subd. (b), Stats. 2010, ch. 620, § 6.)  At the same time, Probate Code section 21380 et seq. was enacted, effective January 1, 2011.  (Stats. 2010, ch. 620, § 7.)

Probate Code section 21380, as relevant here, now provides:

"(a) A provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence:

"(1) The person who drafted the instrument.  [¶] . . .

11

"(3) A care custodian of a transferor who is a dependent adult . . . . [¶] . . . [¶] . . .

"(b) The presumption created by this section is a presumption affecting the burden of proof.  The presumption may be rebutted by proving, by clear and convincing evidence, that the donative transfer was not the product of fraud or undue influence.

"(c) Notwithstanding subdivision (b), with respect to a donative transfer to the person who drafted the donative instrument . . . , the presumption created by this section is conclusive."

Probate Code section 21382 provides:

"Section 21380 does not apply to any of the following instruments or transfers:

"(a) A donative transfer to a person who is related by blood or affinity, within the fourth degree, to the transferor or is the cohabitant of the transferor.  [¶] . . .

"(c) An instrument that is approved pursuant to a[] [court] order . . . .  [¶] . . .

"(e) A donative transfer of property valued at five thousand dollars ($5,000) or less . . . ."

Probate Code section 21384 provides:

"(a) A gift is not subject to Section 21380 if the instrument is reviewed by an independent attorney . . . ."

Probate Code section 21392 provides:

"(a) This part shall apply to instruments that become irrevocable on or after January 1, 2011."

Again, to summarize:  For purposes of this case, the effect of Probate Code section 21380 et seq. is the same as the effect of Probate Code former section 21350 et seq.; a "donative transfer" above a certain minimum value to an unrelated drafter of the transfer instrument is invalid — even if the transferee could disprove fraud, menace, duress, and undue influence — unless it has been either reviewed by an independent attorney or approved by a court.

B.      *Effect of the Repeal of Probate Code Former Section 21350 Et Seq.*

Preliminarily, Teegarden contends that the repeal of Probate Code section 21350 et seq. "destroyed" Jenkins's claims.

The principle on which Teegarden relies is known as the statutory repeal doctrine. (*Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1151.) "Under that doctrine, . . . '"where a right or a right of action depending solely on statute is altered or repealed by the Legislature, in the absence of contrary intent, e.g., a savings clause, the new statute is applied even where the matter was pending prior to the enactment of the new statute."' [Citation.]"  (*Ibid.*)

When the Legislature repealed Probate Code section 21350 et seq., it did not include an express saving clause.  However, it did reenact Probate Code section 21350 et seq. as Probate Code section 21380 et seq., with only minor changes.  Admittedly, the new statute, by its terms, applied only to instruments that became irrevocable on or after January 1, 2011.  Nevertheless, under Probate Code section 3, subdivision (g), "If [a] new law does not apply to a matter that occurred before the operative date, the old law

13

continues to govern the matter *notwithstanding* its amendment or *repeal by the new law*." (Italics added.)

There is evidence that this is what the Legislature intended. The Law Revision Commission's comments on Probate Code section 21392 stated: "Subdivision (a) of Section 21392 limits the application of this part to instruments that become irrevocable on or after January 1, 2011. *Instruments that became irrevocable before that date are governed by the former law*." (Cal. Law Rev. Com. com., 54A pt. 2 West's Ann. Prob. Code (2011 ed.) foll. § 21392, p. 260, italics added.) "'The Commission's official comments are deemed to express the Legislature's intent.' [Citation.]" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1137-1138, fn. 20.)

We therefore conclude that Jenkins's claims survived the repeal.

C.      *Statutory Interpretation*.

We turn to the meaning of "donative transfer" under Probate Code former section 21350.

"Statutory interpretation is a question of law that we review de novo. [Citation.]" (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) "Our goal in construing a statute is 'to determine and give effect to the intent of the enacting legislative body.' [Citation.] '"We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the plain, commonsense meaning of a

14

statute's words is unambiguous, the plain meaning controls.' [Citation.] If, however, the statute is susceptible to more than one interpretation, we 'may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.]' [Citation.]" (*Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490.)

### 1. *Plain meaning*.

There is no statutory definition of a donative transfer. In plain English, "donative transfer" means gift. But then why did the Legislature choose to use the long Latinate noun phrase instead of the short Anglo-Saxon word? This is at least some indication that it intended the term to have a specialized meaning. In any event, both "donative transfer" and "gift" are ambiguous. In most legal contexts, a gift means a transfer without any consideration at all. (E.g., Civ. Code, § 1146 [defining gift of personal property].) However, in some contexts, it can mean a transfer for inadequate or disproportionate consideration. (E.g., *Salmon v. Wilson* (1871) 41 Cal. 595, 605-606 [deed by father to children of 25,000 acres in exchange for $461 was a gift].) In still other contexts, a transfer for consideration can be viewed as a gift in part, to the extent that the value of the property transferred exceeds the value of the consideration. (See Gov. Code, § 82028, subd. (a) [for purposes of Political Reform Act, gift means "any payment that confers a personal benefit on the recipient, to the extent that consideration of equal or greater value is not received . . . ."].)

2.    *Legislative history*.

Because the statute is ambiguous, we turn to its legislative history.

a.    *Probate Code former section 21350 as initially proposed*.

Probate Code former section 21350 was first enacted in 1993.  (Stats. 1993, ch. 293, § 8.)  The immediate impetus for the bill was a series of articles in the Los Angeles Times about an attorney named James D. Gunderson, who had "engaged in a series of highly questionable, if not, arguably, illegal acts" by drafting wills and trusts that named him as a beneficiary of his clients' estates.  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended Feb. 4, 1993, p. 1.)[6]

A committee analysis of an early version of the bill quoted the following language from *Magee v. State Bar* (1962) 58 Cal.2d 423, 433:  "There is no rule that attorneys should never draw wills in which they receive gifts . . .  Even though an attorney may be acting only to carry out the wishes of his client in drawing a will containing a gift to himself, he should send the client to another lawyer *when the circumstances would support an inference of wrongdoing*.  In the instant case, [the attorney] should have taken the initiative in having [the client] consult another lawyer."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended Feb. 4, 1993, p. 4, italics added.)  The analysis then stated:  "[The bill] codifies the standard announced in Magee."  (*Ibid*.)

---

[6]    Available at <http://www.leginfo.ca.gov/pub/93-94/bill/asm/ab_0001-0050/ab_21_cfa_930208_101917_asm_comm>, as of October 17, 2014.

16

b.      *Probate Code former section 21350 as amended before*

*enactment.*

One early version of the bill invalidated any "transfer, including a gift," that

otherwise met its requirements.  (Assem. Bill No. 21 (1993-1994 Reg. Sess.), as amended

June 17, 1993, p. 11.)  There was concern, however, that this could be construed to

include "even transfers for fair and adequate consideration."  (Sen. Com. on Judiciary,

Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended June 17, 1993, p. 8.)[7]

Accordingly, the bill was amended so as to invalidate only a "donative transfer."

(Assem. Bill No. 21 (1993-1994 Reg. Sess.), as amended June 30, 1993, p. 11.)

c.      *Probate Code 21350 as enacted in 1993.*

The original version of Probate Code section 21350, as enacted in 1993, provided:

"(a) Except as provided in Section 21351, no provision, or provisions, of any

instrument shall be valid to make any donative transfer to any of the following:

"(1) A person, including an attorney, conservator, or other person having a

fiduciary relationship with the transferor, who drafted, transcribed, or caused to be

drafted or transcribed, the instrument."  (Stats. 1993, ch. 293, § 8.)

Significantly, it was not entirely clear whether this encompassed a nonfiduciary

drafter.  It could be argued that, under the principle of *ejusdem generis* (see generally *In*

*re Corrine W.* (2009) 45 Cal.4th 522, 531), the word "person" was limited by the words

---

[7]      Available at <http://www.leginfo.ca.gov/pub/93-94/bill/asm/ab_0001-
0050/ab_21_cfa_930617_113305_sen_comm>, as of October 17, 2014.

"an attorney, conservator, or other person having a fiduciary relationship with the transferor"; if so, then the statute did *not* invalidate a donative transfer to a drafter who was *not* an attorney, conservator, or similar fiduciary.  This interpretation would be consistent with the legislative history, which, as we have discussed, focused on Attorney Gunderson and attorney-drafted instruments.

          d.        *Probate Code 21350 as amended in 1995*.

In 1995, Probate Code section 21350 was amended so as to provide:

"(a) Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following:

     "(1) The person who drafted the instrument."  (Prob. Code, former § 21350, subd. (a)(1), Stats. 1995, ch. 730, § 12.)

In other words, the amendment made it clear that a donative transfer to *any* drafter — not just a fiduciary — was invalid.

          e.        *Conclusions based on the legislative history*.

We draw several conclusions from this legislative history.

First, from the discussion of *Magee*, it appears that the bill was intended to invalidate a gift to an attorney drafter "'when the circumstances would support an inference of wrongdoing.'"  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended Feb. 4, 1993, *supra*, p. 4, quoting *Magee v. State Bar*, *supra*, 58 Cal.2d at p. 433.)  A transfer for zero consideration is certainly one such circumstance.  However, a transfer for inadequate consideration is also a classic

18

suspicious circumstance.  (See *Herbert v. Lankershim* (1937) 9 Cal.2d 409, 426, 471, 476 [confidential relationship combined with grossly inadequate consideration give rise to a presumption of undue influence].)

Second, the Legislature selected the term "donative transfer" because it wanted to exclude "transfers for fair and adequate consideration."  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993-1994 Reg. Sess.) as amended June 17, 1993, *supra*, p. 8.)  It follows that it intended "donative transfer" to *include* transfers for *unfair or inadequate* consideration.

Third, in 1995, the Legislature took deliberate action to invalidate donative transfers to all drafters, including nonfiduciaries.  This is significant because, if one were to look *only* at the legislative history from 1993, one could conclude that the Legislature was concerned about transfers for less than adequate consideration *only* when the transferee is an attorney or other fiduciary drafter.  However, when one also looks at the 1995 amendment and the legislative history from 1995, one can only conclude that the Legislature was concerned about transfers for less than adequate consideration to *any* drafter.

We note that defining donative transfer as a transfer for less than fair and adequate consideration is also consistent with "the evils to be remedied."  The Legislature was concerned about abuses by drafters, and particularly by attorney drafters.  If minimally sufficient consideration — "the proverbial 'peppercorn'" (*San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 619) — were all

19

that it took to avoid invalidation of a transfer, then Attorney Gunderson would have drafted clauses requiring him to pay a peppercorn as consideration.

We therefore conclude that "donative transfer," as used in Probate Code former section 21350, includes not only a transfer for zero consideration, but also a transfer for unfair or inadequate consideration. But how inadequate is too inadequate? Jenkins urges us to hold that *any* time the value of a transfer exceeds the value of the consideration, the excess should be deemed a donative transfer; she cites authorities dealing with the federal gift tax. But the result of a finding that part of a transfer is subject to gift tax is merely that a tax is due based on the value of that part. By contrast, the results of a finding that part of a transfer to a drafter is donative would be draconian. That part of the transfer would be invalid; the recipient would not be allowed to even *try* to show the absence of undue influence. Thus, requiring a perfect fit between the value of the transfer and the value of the consideration would disrupt too many perfectly innocent transactions after the fact.

A better model can be found in the realm of specific performance. A contract cannot be enforced by specific performance if there is inadequate consideration (Civ. Code, § 3391, subd. (1)), though a breach can still be remedied in damages. In this context, "'[a] consideration, to be adequate, need not amount to the full value of the property.' [Citation.] The test 'is not whether the [vendor] received the highest price obtainable for his property, but whether the price he received is fair and reasonable under the circumstances.' [Citation.]" (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 945 [sales

20

price of $23,500 for property worth as much as $29,000 or $30,000 was adequate consideration when seller accepted a lower price to sell quickly].)  We conclude that this standard best fits the legislative intent.

D.      *Application to These Facts.*

Here, the trial court ruled that a transaction is not a donative transfer if there is at least minimally good consideration.  Thus, it applied an erroneous legal standard.  The next question is whether we should give the trial court an opportunity to make new findings under the correct legal standard.  This turns on whether there was evidence from which it could find that the quitclaim was *not* a donative transfer.

Jenkins had the burden of proving that the quitclaim was a donative transfer.  (Evid. Code, § 500.)  She carried her initial burden of producing evidence by introducing Teegarden's deposition testimony that the only consideration was one dollar and her friendship.  Teegarden, however, testified at trial that she gave three types of consideration for the quitclaim.

First and foremost, Teegarden put approximately $100,000 into improvements to the house.  The parties dispute whether this counts as consideration at all.  Jenkins argues that it does not, because both the house and the improvements ultimately benefited Teegarden herself.  Teegarden argues that it does, because consideration can consist of detriment to the promisee just as much as it can consist of benefit to the promisor.

We may assume, without deciding, that the $100,000 constituted good consideration sufficient to support a contract.  But even if so, it did not constitute fair and

21

adequate consideration. It did not benefit Perry at all; it came out of Teegarden's pocket, and it went right back into Teegarden's pocket. If such consideration sufficed to prevent a transfer from being donative, it would be too easy for a drafter (and particularly an attorney drafter) to subvert the statutory scheme simply by providing that proceeds of the transfer must be used to buy something that the attorney already wants.

Second, Teegarden claimed that she gave Perry her equity in her Sun City house, which she estimated at $45,000 (as of 2003). It must be remembered that they had already entered into an entirely separate deal regarding the Sun City house; Perry bought it by paying off the $205,000 mortgage, and he gave Teegarden the right to repurchase it for $205,000. Thus, Perry already owned the Sun City house — including the $45,000 equity in it — subject only to Teegarden's option to repurchase it for $45,000 less than it was worth. When she moved into the subject property instead, she gave up her repurchase option. But there was no evidence that, as of 2007, she could have raised $205,000 for the repurchase. If not, then her option was worth zero. In any event, even assuming Teegarden effectively made Perry $45,000 richer, $45,000 plus $100,000 still was not adequate consideration for a $480,000 house. (*Paratore v. Perry* (1966) 239 Cal.App.2d 384, 387 and cases cited [$4,100 not adequate for property worth $6,200; $30,000 not adequate for property worth $35,000; $1,800 not adequate for property worth $2,500].)

Third and finally, Teegarden agreed to provide Perry with continued care. However, she had already been providing him with care between 2002 and 2007 in

22

exchange for payments averaging about $10,000 to $12,000 a year. Between 2007 and 2011, she continued to provide him with care in exchange for payments of approximately $10,000 a year. There was no evidence that she worked any longer or provided any additional services; Perry still had other caregivers. Once again, even assuming that her continued care constituted consideration sufficient to support a contract, the value of that care was largely canceled out by Perry's cash payments. If there was any excess value, it was trivial.

In sum, there was no evidence that Teegarden gave adequate consideration for the quitclaim; hence, the quitclaim was a donative transfer as a matter of law. Inasmuch as Teegarden has already had a full and fair opportunity to litigate this issue, we see no point in remanding for reconsideration of it. (See *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1150.)

Teegarden does not dispute that she was the drafter of the quitclaim within the meaning of Probate Code former section 21350.[8] We deem her to have forfeited any counterargument.

It necessarily follows that the quitclaim was invalid. We therefore need not address Jenkins's contention that the trial court erred by reforming the quitclaim.

---

[8] Jenkins claims that Teegarden admitted that she was the drafter. This is putting it too strongly. Teegarden did admit that she "drafted and prepared" the quitclaim deed by filling in the blanks in the form. However, she never took any position, one way or the other, on whether this made her the "drafter" within the meaning of Probate Code former section 23150.

IV

THE SCOPE OF TEEGARDEN'S TESTIMONY

Jenkins also contends that the trial court erred by allowing Teegarden to testify that the quitclaim was not the product of undue influence.

A.     *Additional Factual and Procedural Background*.

Teegarden admitted that she was the one who filled in the blanks in the quitclaim deed before it was signed.  Early in the first phase of trial, counsel for Jenkins also introduced Teegarden's admission in her deposition that the only consideration that she gave for the quitclaim was one dollar and her friendship.

Counsel for Teegarden asked Teegarden if she ever spent the night at the Perrys' house.  Counsel for Jenkins objected based on relevance.  The trial court overruled the objection, but it allowed "a standing objection on relevance to this line of questioning . . . ."

Counsel for Jenkins also objected based on relevance to questions about whether Teegarden socialized with Loyce and about whether Teegarden paid for improvements to the house.  The trial court overruled these objections.

B.     *Analysis*.

As Jenkins notes, under Probate Code former section 21350, if a transaction constitutes a donative transfer to a drafter, and if none of the statutory exceptions apply, the transaction is invalid; the transferee is not allowed to try to prove that the transaction was free of undue influence.  Moreover, the trial court is not allowed to find the absence

of undue influence based solely on the testimony of the drafter. Jenkins therefore argues that the trial court erred by allowing Teegarden to testify that the quitclaim was not the product of undue influence.

This argument confuses the issue of a donative transfer to a drafter with the issue of undue influence. Jenkins treats these as interchangeable, on the theory that, once a transaction has been proven to be a donative transfer to a drafter, there is a "conclusive presumption of undue influence." Hence, in her view, evidence offered to disprove a donative transfer necessarily is also offered to disprove undue influence.

This does not correctly describe the operation of Probate Code former section 21350. (See generally J. Phillips, *Irrebuttable Presumptions: An Illusory Analysis* (1975) 27 Stan. L. Rev. 449.) It would be more accurate to say that a donative transfer to a drafter is treated *as if it were* the product of undue influence. However, the transferee is always allowed to try to prove that there was no donative transfer at all.

Here, disproving *undue influence* was not the thrust of the challenged testimony. Rather, Teegarden was trying to disprove a *donative transfer*. For example, the fact that she paid for improvements to the house tended to show that she actually gave good consideration as bargained for between her and Perry. As we held in part III.D, *ante*, this testimony ultimately fell short of proving that she gave *fair and adequate* consideration. Nevertheless, it was by no means irrelevant. (See Evid. Code, § 210 ["'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].)

Jenkins's real grievance seems to be that Teegarden was allowed to contradict her admission in her deposition. Deposition testimony, however, is not a binding judicial admission. A party can contradict his or her own deposition testimony at trial, subject only to the use of the deposition for impeachment. (Code Civ. Proc., § 2025.620, subd. (a); *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522-1523.)

We also note that, even assuming the challenged testimony *was* offered to disprove undue influence, it was still relevant. Jenkins was claiming that the quitclaim was invalid under Probate Code for section 21350 for two distinct reasons — not only because it was a donative transfer to a drafter, but also because it was a donative transfer to the care custodian of a dependent adult. If the trial court found that it was a donative transfer to the care custodian of a dependent adult, Teegarden would have been allowed to try to disprove undue influence. Thus, again, evidence disproving undue influence was not irrelevant. Moreover, while the trial court could not find the absence of undue influence based *solely* on the testimony of the drafter, there was documentary evidence and, for all the trial court knew at the time, there could have been other witnesses that corroborated Teegarden's testimony.

Finally, the asserted error was harmless. In part III.D, *ante*, we held that, even if all of Teegarden's testimony is accepted, it fell short of disproving a donative transfer.

V

STATUTE OF LIMITATIONS

Teegarden contends that the statute of limitations had run on Jenkins's claim to invalidate the quitclaim.

Teegarden, however, failed to raise the statute of limitations as an affirmative defense in her responsive pleading. "The general rule is firmly established that if a statute of limitation is not pleaded it is waived. [Citation.]" (*Hall v. Chamberlain* (1948) 31 Cal.2d 673, 679; see also Prob. Code, § 1000 ["Except to the extent that this code provides applicable rules, the rules of practice applicable to civil actions . . . apply to, and constitute the rules of practice in, proceedings under this code."].) Raising the statute of limitations for the first time in a trial brief is too little, too late. (*Martin v. Van Bergen* (2012) 209 Cal.App.4th 84, 91.)

Teegarden points out that Jenkins affirmatively alleged that the action was timely; Teegarden denied this. Teegarden argues that her denial "plac[ed] the statute of limitations in issue." Not so. "A mere denial is insufficient to raise the bar of limitations." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1117.) "[I]f the defense appears on the face of the complaint, it must be raised by demurrer; otherwise it must be specially pleaded in the answer . . . [citations]." (*O'Neil v. Spillane* (1975) 45 Cal.App.3d 147, 156.) Merely pleading facts showing that the action is barred — or, as in this case, *denying* facts showing that the action is *not* barred — is insufficient. "The essence of the rule requiring the statute to be pleaded is to apprise plaintiff that defendant

27

intends to rely upon that defense. While it may be that inferentially, the times being stated, it follows that the action was not timely filed under the statute, yet more is required. There must be some expression that lateness of the commencement of the action is a ground of defense." (*Hall v. Chamberlain*, *supra*, 31 Cal.2d at p. 680.)

We therefore conclude that we cannot uphold the judgment for Teegarden based on the statute of limitations. Moreover, Teegarden is not entitled to a remand for reconsideration of this issue. The trial court quite properly declined to rule on the applicability of the statute of limitations.

VI

TEEGARDEN'S UNPLEADED COUNTERCLAIMS

This brings us to the question of the appropriate appellate remedy. It is undisputed that Teegarden used approximately $100,000 of her own money to make improvements to the subject property. As Jenkins concedes, Teegarden could have cross-complained for relief as a good faith improver. (Code Civ. Proc., § 871.1 et seq.); however, she never did.

Jenkins therefore argues that it is too late for Teegarden to assert such a counterclaim. Jenkins further argues that, even if Teegarden could still assert a claim as a good faith improver (or on some other theory), then Jenkins would be entitled to an offset for (1) the reasonable rental value of the subject property and (2) attorney fees based on elder abuse (see Welf. & Inst. Code, § 15657.5, subd. (a)).

Our holding means that Jenkins is entitled to "restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment . . . ." (Code Civ. Proc., § 908.) "Whether a party is entitled to restitution following reversal 'present [s] a question calling for judicial discretion in determining what equity required.' [Citation.] On remand, the trial court will have discretion to consider Jenkins's claim of an offset for reasonable rental value and Teegarden's claim of $100,000 investment in the subject property. We express no view with respect to how the court should exercise its discretion.[9]

We note, however, that the trial court has already implicitly rejected Jenkins's financial elder abuse claim. Financial elder abuse requires the taking of the property of an elder for a wrongful use, with the intent to defraud, or by undue influence. (Welf. & Inst. Code, § 15610.30, subds. (a)(1), (a)(3).) Our holding that the quitclaim was invalid under Probate Code former section 21350 does not resurrect this claim and does not make Jenkins entitled to attorney fees.

---

[9]     It appears to be undisputed that, while the appeal was pending, Teegarden sold the subject property. The trial court allowed her to have $100,000 of the proceeds but ordered that the remainder be deposited in a blocked account. We hereby grant Jenkins's request for judicial notice that the blocked account has been set up in Teegarden's name. The fact that the subject property has been reduced to cash should simplify the trial court's restitution determination.

## VII

## DISPOSITION

The judgment is reversed.  The matter is remanded for further proceedings not inconsistent with this opinion.  Because, under our opinion, Jenkins remains the Trustee of the proceeds of the subject property, the trial court is directed to order that the funds in the blocked account be placed in the name of Jenkins, as Trustee, pending further order of the trial court.  Jenkins is awarded costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

30