Filed 2/26/15 (unmodified opn. attached)

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| JEFFREY SIEGEL, as Trustee, etc.<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELISABETH FIFE,<br><br>    Defendant and Appellant. | B253746<br><br>  (Los Angeles County<br>  Super. Ct. No. BP135326)<br><br><br>MODIFICATION ORDER<br>[CHANGE IN JUDGMENT] |

The opinion filed February 26, 2015 is modified as follows:

1.  On page 1, the reference to "MICHAEL WILSON" is deleted and replaced with "JEFFREY SIEGEL."

2.  On page 8, at the conclusion of the first paragraph, the following sentence is to be inserted:  "While the appeal was pending, Mr. Siegel was substituted in place of Michael as the new successor trustee."

3.  On page 14, delete the reference to "Michael Wilson" and replace it with "Jeffrey Siegel."

_____          _____
        TURNER, P.J.                              KRIEGLER, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JEFFREY SIEGEL, as Trustee, etc.<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELISABETH FIFE,<br><br>Defendant and Appellant. | B253746<br><br>(Los Angeles County<br>Super. Ct. No. BP135326) |

APPEAL from an order of the Superior Court of Los Angeles County, James A. Steele, Judge.  Affirmed.

Law Offices of Phillip K. Fife and Phillip K. Fife for Defendant and Appellant.

Orren & Orren and Tyna Thall Orren; Paul F. Cohen; and Leslie Barnett for Plaintiff and Respondent.

## I. INTRODUCTION

The objector, Elisabeth Fife, appeals from a probate court's order confirming the sale of real property belonging to a trust. The objector is a beneficiary of the Betty Jean Brown Revocable Trust, dated September 1, 2005 (the 2005 trust). The trust provided that upon Ms. Brown's death, the objector would receive specific real property for the care of Ms. Brown's cats. Ms. Brown's conservator, Jeffrey Siegel, filed a probate court petition seeking approval of the sale of that specific real property belonging to the trust. Mr. Siegel contended the sale of the real property was necessary for the benefit of the settlor, Ms. Brown. Ms. Brown was under a conservatorship and resided in assisted living. Mr. Siegel argued that the conservatorship estate lacked funds to maintain Ms. Brown's care during her life. Mr. Siegel asserted the immediate sale of the real property was necessary. The trustee agreed with the conservator. The probate court agreed with Mr. Siegel and overruled the objections. It conducted an overbid for the real property. Upon receiving a satisfactory bid, the probate court ordered the real property be sold. The objector contends the probate court's order granting the petition to sell the real property violated Probate Code section 21402 regarding the abatement order for trust assets.[1] We affirm the order permitting the sale to be completed.

## II. BACKGROUND

### A. Ms. Brown's September 1, 2005 Trust

Ms. Brown is the settlor and beneficiary of the 2005 trust. Ms. Brown was the first trustee and primary beneficiary. The 2005 trust was amended on April 12, 2007, by the first amendment. The second amendment amended the 2005 trust on August 14,

---

[1] Future statutory references are to the Probate Code.

2011.  The amended 2005 trust provides, "At the death, resignation or incapacity of Betty Jean Brown, George Wilson shall serve as the first successor sole trustee.  If George Wilson shall fail or refuse to act as first successor sole trustee, his son Michael Wilson shall serve as the second successor sole trustee."[2]  George is a longtime friend of Ms. Brown.  By the second amendment to the 2005 trust, Ms. Brown made the trust irrevocable.  On September 1, 2011, Ms. Brown resigned as trustee.

The trustee is vested under the 2005 trust with several powers:  "To carry out the purposes of this trust and subject to any limitations stated elsewhere in this declaration of trust, the trustee is vested with the following powers, in addition to any now or hereafter conferred by law: [¶] . . . [¶] 2.  To sell or convey, at public or private sale, for cash or credit; to exchange; to divide; to grant options; and to abandon a trust asset or any interest therein."  The 2005 trust provides for the settlor during her lifetime under section 3.03: "During the lifetime of the Settlor, the trustee shall at least annually, unless otherwise directed by the settlor in writing, pay to or apply to the benefit of the settlor, all of the net income from the trust estate. [¶] During the lifetime of the settlor, should the net income of the trust estate be insufficient to provide for the care, maintenance, support, or desires of the settlor as hereinafter defined, the trustee may from time to time, in the trustee's sole and absolute discretion, pay to or apply for the benefit of the settlor, such amounts from the principal of the trust estate as the trustee deems necessary or advisable for the care, maintenance, support or desires of the settlor.  As used in this section, the term 'care, maintenance, support or desires of the Settlor shall mean: [¶] B. [sic] The providing of proper care, maintenance and support for the settlor during any period of illness, or other want of necessity; [¶] C.  The maintenance of the settlor in the manner of living to which the settlor is accustomed on the date of this declaration; [¶] D.  The settlor's desire to withdraw assets of any kind in any amount which does not otherwise violate the terms and provisions of this trust. [¶] In interpreting the provisions of this

---

[2]      Several individuals share the same last name.  For ease of reference, the court shall refer to them by their first name.  No disrespect is intended.

3

section, the trustee shall use broad discretion for the settlor's rights to withdraw principal, and rights of any remaindermen shall be considered of secondary importance."

Upon Ms. Brown's death, the 2005 trust's assets were to be distributed as follows under section 5.02. George would receive the Iron County, Utah property, all of Ms. Brown's personal property excluding her cats and any remainder of the 2005 trust. The objector would receive the house at 1321 Edgecliffe Drive in Los Angeles, California (the Edgecliffe house) as well as Ms. Brown's cats. The 2005 trust would retain $50,000 for the care of the cats and upkeep of the Edgecliffe house. Richard, Carmen and Tony Perez were to receive $5,000 each.[3] Richard Martin, Ms. Brown's second cousin, was to receive land in Riverside County, California. Ms. Brown was not deceased at the time of the filing of the notice of appeal.

### B. The Purported 2011 Trust and Appointment of Mr. Siegel as Conservator

Ms. Brown formerly lived at 1651 East 85th Street in Los Angeles, California (the 85th Street house). Ms. Brown lived at the Edgecliffe house beginning in 1999 after the death of her brother. The objector, who lived across the street from the Edgecliffe house, began assisting Ms. Brown with errands in 2007. The objector cared for Ms. Brown's cats. The objector described how she began to care for the cats in her own home: ". . . I found the interior of [Ms. Brown's] home to be in a deplorable condition and exhibiting no kind of cleaning being done to it. There seem to be fewer things in the house, from which I inferred that Martin and/or Perez had taken things from the house, but the house remained far dirtier than it had been when Carmen and I first cleaned it and not a very healthy environment for [Ms. Brown] or her cats to live in. [Ms. Brown's] twelve cats remained in my house, where I continue to provide for their care." As of the filing date of the notice of appeal, the objector continued to care for Ms. Brown's cats.

---

**3**     For clarity's purpose we will refer to Richard Perez as Mr. Perez.

4

In 2010, Mr. Perez began performing maintenance work on the Edgecliffe and the 85th Street houses. Mr. Perez lived across the street from the 85th Street house. From 2010 forward, both Mr. Martin and Mr. Perez attempted to isolate Ms. Brown from the objector and George. Ms. Brown amended her trust to be irrevocable because she felt she would inevitably be unable to resist pressure by Mr. Martin to change her estate plan to benefit him.

In the fall of 2011, Mr. Martin and Mr. Perez moved Ms. Brown from the Edgecliffe house back to the 85th Street residence. Both the objector and George lost contact with Ms. Brown. On October 11, 2011, Ms. Brown purported to execute a new trust (the 2011 trust). The 2011 trust purported to revoke the 2005 trust. The 2011 trust named Mr. Martin as trustee and devised Ms. Brown's entire estate to him upon her death.

On January 23, 2012, Ms. Brown filed a voluntary petition for appointment of a conservator for her estate and person. The probate court granted the petition on March 20, 2012. Mr. Siegel was appointed conservator. Conservatorship letters were issued on March 26, 2012. The probate court brought both the 2005 and 2011 trusts under its supervision by the order. Mr. Siegel was also appointed interim successor trustee of both the 2005 and 2011 trusts.

On June 21, 2012, as interim successor trustee, Mr. Siegel filed a petition for an order to determine: the validity of the 2011 trust documents; reinstatement of the original estate planning documents; revocation of the 2011 trust; affirming terms of the 2005 trust; and nullifying three deeds. On December 20, 2012, the probate court granted the June 21, 2012 petition. The probate court declared the 2011 trust void and nullified three purported deeds of transfer. The probate court also declared the 2005 trust as amended to be the operative trust. On April 26, 2013, Mr. Siegel formally resigned as interim successor trustee. The probate court appointed Michael as successor trustee due to George's inability to act as successor trustee. The 2005 trust remains under court supervision.

C.  The Trustee's Petition to Sell Real Property Including the Edgecliffe House

Michael, as trustee, placed the Edgecliffe house, the 85th Street residence and the five vacant lots adjacent to the latter property on sale.  On November 26, 2013, the trustee received a bid to sell the Edgecliffe house for $560,000.  On December 2, 2013, the trustee filed a report of sale and petition for an order confirming sale of the real property.

Mr. Siegel, as conservator, moved Ms. Brown from the 85th Street house to an assisted living apartment named Kingsley Manor.  Mr. Siegel believed returning Ms. Brown to living at the Edgecliffe house not to be in her best interest.  The trustee submitted evidence that repairing the Edgecliffe house was financially infeasible.  P. Hernandez Builders provided an itemized description of the work needed to fix the Edgecliffe house and estimated a cost of over $225,000 to repair the residence.  As noted, the Edgecliffe house was appraised at only $685,000.

The conservator attested that Ms. Brown's conservatorship estate was out of funds as of December 31, 2013.  According to the conservator, Ms. Brown's assisted living costs were $4,000.  There were additional costs for incidental expenses, property taxes and maintenance of real property.  Ms. Brown also owed Kingsley Manor several months of payments for her care.  The conservator also declared capital gains taxes would not be a significant liability if the Edgecliffe house is sold.

On December 23, 2013, the objector filed her opposition to the petition seeking confirmation of the sale of the Edgecliffe house.  The objector argued:  there was no showing a sale of trust assets was necessary; this was because the conservator, Mr. Siegel, had sufficient cash reserves to support Ms. Brown for two years; and section 21402, subdivision (a) required the trustee to first sell off the assets comprising the residue of the trust before selling assets designated as specific gifts.  The objector

6

explained: ". . . [Ms. Brown] made clear that the welfare of her cats was very important to her and she provided that $50,000 of her trust estate should be kept in trust for 'the care of the cats and the upkeep of the Edgecliffe house where the cats will live until the last cat has died from natural causes.' She directed that her 'real property at 1321 Edgecliffe Dr. shall be distributed to my friend Eli[s]abeth Fife. . . . The Trustee's proposed sale of the [Edgecliffe property] not only deprives Elisabeth Fife of the prospective right to receive the [Edgecliffe property] upon the death of [Ms. Brown], but also defeats [Ms. Brown]'s plan that the person to whom she wants the [Edgecliffe property] to go will have that property available for the cats to live out their days there. Elisabeth Fife plans to keep the promise she made to [Ms. Brown] to care for her cats . . . ."

On December 31, 2013, Michael filed his response to objector's opposition. Michael, the trustee, argued he did not violate his fiduciary duties because he listed the Edgecliffe house, the 85th Street house, and the five vacant lots for sale concurrently. The conservator, Mr. Siegel, represented that Ms. Brown needed funds for her care. Michael argued: based on a review of the recent accounting, Ms. Brown's income was $2,800 a month while her expenses were $11,000 a month; the expenses included caregiving, assisted living, property taxes, insurance, maintenance and upkeep of the trust properties; when combined with the court-authorized conservator and attorney fees, there were no funds remaining and there were insufficient funds to pay for a 24-hour caregiver if Ms. Brown returned to living at the Edgecliffe house. Additionally, Michael argued the objector could recover a general pecuniary gift after Ms. Brown's passing for the sale of the Edgecliffe house under section 21134, subdivision (a).

On January 6, 2014, after the hearing, the probate court overruled the objections. The probate court noted the settlor, Ms. Brown, needed funds while she was living. The probate court held an overbid for the Edgecliffe house. The probate court accepted a bid of $650,000 for the Edgecliffe house. The objector appealed the order. On January 28, 2014, the probate court ordered the petition for sale of real property confirmed.

7

On June 16, 2014, Michael resigned as successor trustee of the trust. The probate court appointed Mr. Siegel as successor trustee. Mr. Siegel has taken the place of Michael as trustee for purposes of this appeal. After the filing of the notice of appeal, we issued a writ of supersedeas staying the sale of the Edgecliffe house. (*Wilson v. Fife* (Apr. 22, 2014, B253746) [nonpub. order].)

## III. DISCUSSION

### A. Trustee Power to Sell Trust Property

Under section 16266, "The trustee has the power to acquire or dispose of property, for cash or on credit, at public or private sale, or by exchange." (See *Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1132.) A trustee may file a petition in the probate court to approve certain actions, including the sale of real property. (§ 17200, subd. (b)(5) ["Settling the accounts and passing upon the acts of the trustee, including the exercise of discretionary powers"]; see *Bellows v. Bellows* (2011) 196 Cal.App.4th 505, 511.) The probate court has discretion to make any necessary and appropriate orders, including approving a sale of trust real property. (§ 17206; see *Alemany v. Wensinger* (1870) 40 Cal. 288, 293.) Here, the trust provides the trustee with authority to sell the trust's assets in section 2.02.

### B. Reduction in the Objector's Share of the Estate

The objector contends the proposed sale of the Edgecliffe house violates section 21402, subdivision (a). This case involves two distinct standards of review. In part, we must construe the abatement statutes which permit the reduction of the devises of a trust. We review the construction of a statute de novo. (*Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1138; *Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1126-1127.) Also, as we will explain, we must interpret the terms of the 2005 trust. Our Supreme

8

Court has held:  "The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein.  [Citations.]"  (*Burch v. George* (1994) 7 Cal.4th 246, 254; *see Tunstall v. Wells* (2006) 144 Cal.App.4th 554, 561 [same]; see § 21102, subd. (a) ["The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."].)  Our Supreme Court has explained:  "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.]  It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence."  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 (*Parsons*); *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888.)  In the case of undisputed evidence but conflicting inferences, we apply the following standard of review, "[W]here the evidence is undisputed and the parties draw conflicting inferences, [the appellate court] will independently draw inferences . . . ."  (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal. App.4th 64, 71 [interpretation of written documents]; see *Parsons*, *supra*, 62 Cal.2d at p. 866, fn. 2 [interpretation of written instruments].)  Section 21121 provides:  "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole.  If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument."  (See *Colburn v. Northern Trust Co.* (2007) 151 Cal.App.4th 439, 449, fn. 2.)

Where a trust makes provisions for particular persons, but the settlor's property is insufficient to fully pay all the debts, some devises may be reduced to pay the trust obligations.  (*Burkett v. Capovilla* (2003) 112 Cal.App.4th 1444, 1452; see *In re Buck's Estate* (1948) 32 Cal.2d 372, 376; 14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 658, p. 745.)  In the context of wills, the Law Revision Commission described abatement or reduction of a distribution thusly, "[I]f property not disposed of by a decedent's will and residuary property are not sufficient to pay debts, expenses of

9

administration, or family allowance, then general and specific devises must be abated (reduced)." (Recommendation Relating to Abatement (Nov. 1987) 19 Cal. Law Revision Com. Rep. (1987) p. 869.) Section 21400 states, "[I]f the instrument provides for abatement, or if the transferor's plan or if the purpose of the transfer would be defeated by abatement as provided in this part, the shares of beneficiaries abate as is necessary to effectuate the instrument, plan, or purpose." (See *Valentine v. Read* (1996) 50 Cal.App.4th 787, 792; Witkin, *op. cit.*, § 658, p. 745.)

We now turn to section 21402, subdivision (a) which governs the reduction of a beneficiary's share of an estate. Section 21402, subdivision (a) serves as the legal basis for the objector's contention the *sale* of the Edgecliffe house may not occur. Section 21402, subdivision (a) states in part: "(a) Shares of beneficiaries abate in the following order: [¶] . . . [¶] (2) Residuary gifts . . . . [¶] . . . [¶] (5) Specific gifts to persons other than the transferor's relatives."[4] (See § 21401; *Burkett v. Capovilla*, *supra*, 112 Cal.App.4th at p. 1452.) The objector argues the Edgecliffe house, which is a specific gift to her, should have abated only after residuary gifts had been reduced or depleted altogether. According to the objector, the residuary gifts must be sold prior to the Edgecliffe house in order to provide for Ms. Brown's needs. The trustee argues he is authorized under the 2005 trust to apply trust principal to provide care and support for Ms. Brown. We must then examine the 2005 trust language to determine whether the trustee has authority to sell the Edgecliffe house as he proposes.

We turn to the pertinent provisions of the 2005 trust—sections 3.03 and 5.02. Section 3.03 of the 2005 trust grants the trustee broad authority to sell assets to provide for Ms. Brown's care. As noted previously, section 3.03 provides, "During the lifetime

---

[4]    Section 21402 states in its entirety: "(a) Shares of beneficiaries abate in the following order: [¶] (1) Property not disposed of by the instrument. [¶] (2) Residuary gifts. [¶] (3) General gifts to persons other than the transferor's relatives. [¶] (4) General gifts to the transferor's relatives. [¶] (5) Specific gifts to persons other than the transferor's relatives. [¶] (6) Specific gifts to the transferor's relatives. [¶] (b) For purposes of this section, a 'relative' of the transferor is a person to whom property would pass from the transferor under Section 6401 or 6402 (intestate succession) if the transferor died intestate and there were no other person having priority."

10

of the settlor, should the net income of the trust estate be insufficient to provide for the care, maintenance, support, or desires of the settlor as hereinafter defined, the trustee may from time to time, in the trustee's sole and absolute discretion, pay to or apply for the benefit of the settlor, such amounts from the principal of the trust estate as the trustee deems necessary or advisable for the care, maintenance, support or desires of the settlor." Later, section 3.03 states, "[T]he trustee shall use broad discretion for the settlor's rights to withdraw principal, and *rights of any remaindermen shall be considered of secondary importance.*" (Italics added.) Section 5.02 provides for the distribution of Ms. Brown's assets upon her death. As noted, section 5.02 provides after Ms. Brown's death for the distribution of the Edgecliffe house to the objector for the care of the cats.

Construing these two sections together, we agree with the probate court that the trustee is authorized by the 2005 trust to *sell* the Edgecliffe house. Ms. Brown is still alive and no distributions of the 2005 trust estate to beneficiaries have occurred. The trustee has a duty to provide for Ms. Brown's care during her lifetime. Also, the trustee has "sole and absolute discretion" to apply trust principal for Ms. Brown's care. And section 21400 provides that if Ms. Brown's plan "would be defeated by abatement," the shares of beneficiaries are reduced as necessary to effectuate the 2005 trust's plan or purpose. (See *Valentine v. Read*, *supra*, 50 Cal.App.4th at p. 792; Witkin, *op. cit.*, § 658, p. 745.) Here, the 2005 trust requires the trustee to apply trust principal to provide for Ms. Brown's care. If the sale of assets becomes necessary, the 2005 trust expressly states that all remainder interests, which includes the objector's rights to the Edgecliffe house, are secondary. Of further consequence is the precarious nature of the trust estate: Ms. Brown's conservatorship estate was out of funds as of December 31, 2013; the assisted living costs are $4,000 per month; the conservator owes Kingsley Manor several months of back payments for Ms. Browns care; there are additional costs for incidental expenses, property taxes and maintenance and upkeep of the various properties; repairing the Edgecliffe house is financially infeasible; and a contractor has provided an itemized description of the work needed to repair the Edgecliffe house and it would cost over $225,572.33 to repair the residence. As noted, the Edgecliffe house is appraised at only

11

$685,000. The conservator also declared capital gains taxes will not be a significant liability when the Edgecliffe house is sold.

We express no opinion as to priorities for payment in the event that Ms. Brown passes away and funds remain under the control of the trustee. As we have explained, section 21400 provides the beneficiaries' shares are reduced as necessary to effectuate the 2005 trust's plan or purpose. (See *Valentine v. Read*, *supra*, 50 Cal.App.4th at p. 792; Witkin, *op. cit.*, § 658, p. 745.) The issue before us is whether the trustee may *sell* the Edgecliffe house to provide for Ms. Brown's care as required by the 2005 trust. Nothing in the abatement statutes prevent such a *sale*. Pursuant to section 21405, subdivision (a),[5] the probate court fixes the amount the trust's distributees receive after abatement for any purpose including the payment of Ms. Brown's debts. (Recommendation Proposing New Probate Code (Dec. 1989) 20 Cal. Law Revision Com. Rep. (1989) pp. 1984-1985.) The probate court retains the authority to fix the amount that the objector will receive if Ms. Brown passes away and funds remain in her estate. We leave that issue in the good hands of the probate court.

In terms of the abatement issue, one remaining contention of the objector warrants brief comment. The objector contends that because the trust is irrevocable, the sale may not proceed. This contention has no merit. The 2005 trust is an express trust because it contains an explicit declaration of trust followed by a transfer of property to the trustee. (*Adler v. City of Pasadena* (1962) 57 Cal.2d 609, 618; *Bainbridge v. Stoner* (1940) 16 Cal.2d 423, 428.) An express trust is one subject to the Probate Code. (§§ 82, subd. (a)(1)[6]; 15000-15001, subd. (a); *Meyers v. The Retirement Fund of Federated City*

---

[5]   Section 21405 states in its entirety: "(a)  In any case in which there is abatement when a distribution is made during estate administration, the court shall fix the amount each distributee must contribute for abatement. The personal representative shall reduce the distributee's share by that amount. [¶]  (b)  If a specific gift must be abated, the beneficiary of the specific gift may satisfy the contribution for abatement out of the beneficiary's property other than the property that is the subject of the specific gift."

[6]   Section 82 states in its entirety: "(a) 'Trust' includes the following: [¶]  (1)  An express trust, private or charitable, with additions thereto, wherever and however created. [¶]  (2)  A trust created or determined by a judgment or decree under which the trust is to

12

*Employees* (2014) 223 Cal.App.4th 1201, 1206-1207.) Further, section 82, subdivision (b) excludes certain trust-like arrangements from coverage by the Trust Law. (See § 15000; *Valentine v. Read*, *supra*, 50 Cal.App.4th at p. 792.) None of the arrangements identified in section 82, subdivision (b) have any of the characteristics of the 2005 trust in our case. And, more importantly, the Probate Code does not exclude from coverage by the Trust Law irrevocable trusts. The 2005 trust at issue is subject to the foregoing statutory provisions which permit the *sale* of the Edgecliffe house under these circumstances.

## C. The Proposed Sale

We review the probate court's order authorizing the sale of the Edgecliffe house for an abuse of discretion. (*Estate of Barthelmess* (1988) 198 Cal.App.3d 728, 735; *Estate of Da Roza* (1947) 82 Cal.App.2d 550, 553-554.) The probate court did not abuse its discretion by approving the sale of the Edgecliffe house. No abuse of discretion occurred given the precarious state of Ms. Brown's estate as we have described in the preceding section of this opinion. The probate court did not err by granting the petition to confirm the sale of the Edgecliffe house.

---

be administered in the manner of an express trust. [¶] (b) 'Trust' excludes the following: [¶] (1) Constructive trusts, other than those described in paragraph (2) of subdivision (a), and resulting trusts. [¶] (2) Guardianships and conservatorships. [¶] (3) Personal representatives. [¶] (4) Totten trust accounts. [¶] (5) Custodial arrangements pursuant to the Uniform Gifts to Minors Act or the Uniform Transfers to Minors Act of any state. [¶] (6) Business trusts that are taxed as partnerships or corporations. [¶] (7) Investment trusts subject to regulation under the laws of this state or any other jurisdiction. [¶] (8) Common trust funds. [¶] (9) Voting trusts. [¶] (10) Security arrangements. [¶] (11) Transfers in trust for purpose of suit or enforcement of a claim or right. [¶] (12) Liquidation trusts. [¶] (13) Trusts for the primary purpose of paying debts, dividends, interest, salaries, wages, profits, pensions, or employee benefits of any kind. [¶] (14) Any arrangement under which a person is nominee or escrowee for another."

## IV. DISPOSITION

The probate court's January 6, 2014 order is affirmed.  Michael Wilson, as trustee of the Betty Jean Brown Trust, dated September 1, 2005, may recover his appeal costs from objector, Elisabeth Fife.  Our previously entered stay order is vacated effective the date of finality of this opinion.  Any further stay of proceedings should be pursued before our Supreme Court.

**CERTIFIED FOR PUBLICATION**


TURNER, P. J.


We concur:


MOSK, J.


KRIEGLER, J.

14