Filed 8/1/16; part. pub. order 8/25/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PETER L. FUNSTEN,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO BANK, N.A. et al., as Executors,<br><br>     Defendants and Respondents. | A140941<br><br>(San Mateo County<br>Super. Ct. No. PRO 123635) |
| Estate of ROBERT FOLGER MILLER, Deceased.<br><br>GEORGE R. BIANCHI et al., as Executors,<br><br>     Petitioners and Appellants,<br>v.<br>PETER L. FUNSTEN,<br><br>     Objector and Appellant. | A141853<br><br>(San Mateo County<br>Super. Ct. No. PRO 123216) |

**I.**

**INTRODUCTION**

These consolidated appeals arise out of disputes regarding the administration of the Miller Family Trust I (Trust I), which was created by Robert and Maryon Miller in

1

1991.[1]  Trust I became irrevocable when Maryon passed away in 1994.  Robert died many years later in early 2013.

In August 2013, Peter Funsten, who is Maryon's son, filed a "safe harbor" application under former section 21320 of the Probate Code,[2] requesting a judicial determination that he would not violate a "no-contest" clause in the Trust I instrument by filing a petition to establish that he is the sole successor trustee of Trust I, notwithstanding the fact that Robert designated an additional co-successor trustee after Maryon passed away.  The executors of Robert's probate estate, George R. Bianchi and Wells Fargo Bank (Executors), opposed Peter's safe harbor application.  In December 2013, the probate court denied Peter's application, concluding his proposed petition would violate the no-contest clause.  Peter filed a timely appeal from that order.

In January 2014, Executors filed a petition for a determination that Peter violated no-contest clauses in Trust I and in Robert's will by filing creditor's claims against Robert's probate estate to recover damages for the allegedly improper removal of trust assets.  In May 2014, the trial court entered a judgment which found that Peter's conduct constituted a contest of Robert's will, but it did not constitutes a contest under the terms of the no-contest clause in Trust I.  Both Peter and Executors timely appealed the judgment.

We conclude that Peter was not entitled to a ruling on the merits of his safe harbor application because that statutory procedure has not been available since former section 21320 was repealed in January 2010.  Therefore, we affirm the December 2013 order, but only after striking the probate court's finding that Peter's proposed petition constitutes a contest of Trust I.

---

[1]  The appellate record shows that there is also a Miller Family Trust II (Trust II), although that instrument is not at issue in these appeals.  For clarity and consistency, we will use first names to refer to Robert, Maryon and all of their relatives.  No disrespect is intended.

[2]  Subsequent statutory references are to the Probate Code, unless otherwise stated.

We further conclude that the probate court correctly found that Peter did not violate the no-contest clause in Trust I by filing creditor's claims against Robert's probate estate, but that the court erred by finding that such conduct constituted a contest of Robert's will. Peter is not a beneficiary of Robert's will, and thus he could not have violated the no-contest clause in that instrument as a matter of law. Therefore, we reverse the May 2014 judgment and remand this case with directions for the court to enter a new judgment consistent with this decision.

## II.

## OVERVIEW OF LAW

To put the facts of this case in proper perspective, we begin with an overview of California law governing the enforcement of no-contest clauses.

"An in terrorem or no contest clause in a will or trust instrument creates a condition upon gifts and dispositions provided therein. [Citation.] In essence, a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument. [Citation.]" (*Burch v. George* (1994) 7 Cal.4th 246, 254.)

California has long followed the common law rule that no-contest clauses are generally enforceable, but strictly construed and subject to several public policy exceptions. (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422 (*Donkin*).) This rule attempts to reconcile competing policies of (1) "honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument," on the one hand, and (2) "avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument" on the other. (*Ibid.*)

In 1989, legislation was enacted to codify partially this common law. (*Donkin*, *supra*, 58 Cal.4th at p. 423.) The 1989 legislation recognized the general enforceability of no-contest clauses, subject to several express limitations. (*Ibid.*) "The 1989 legislation also established the safe harbor declaratory relief procedure as a method of determining whether a particular motion, petition or other act by a beneficiary would be a

3

contest within the terms of the particular no contest clause. [Citation.] When the Probate Code was repealed and reenacted in 1990, the substance of the 1989 no contest clause provisions was continued, although [the original safe harbor statute] became former section 21320, which was limited to instruments that were or had become irrevocable. [Citation.]" (*Id*. at p. 423, fn. 6.)

In the decades that followed, the Legislature periodically amended the 1990 legislation to comport with and clarify the law as it was developing in the courts. (*Donkin*, *supra*, 58 Cal.4th at pp. 423-425.) For example, in 2000, the Legislature set outer limitations on the enforceability of no-contest clauses in former section 21305. Subdivision (a) of former section 21305 listed actions that did not constitute "a contest unless expressly identified in the no contest clause as a violation of the clause." Subdivision (b) listed actions that did not "violate a no contest clause as a matter of public policy" "[n]otwithstanding anything to the contrary" in the underlying instrument. Such actions included, for example: "(6) A petition challenging the exercise of a fiduciary power." (Former § 21305, subd. (b)(6).)

Unfortunately though, as the no-contest law evolved, "[t]he complexity of the statutory scheme actually promoted further uncertainty as to the scope of application of a no contest clause, which in turn led to widespread use of the safe harbor declaratory relief procedure. The frequent use of the safe harbor procedure added an additional layer of litigation to probate matters, which undermined the goal of a no contest clause in reducing litigation by beneficiaries. [Citation.]" (*Donkin*, *supra,* 58 Cal.4th at p. 424.)

In 2008, the Legislature repealed the 1990 legislation and replaced it "with a new set of statutes governing no contest clauses." (*Donkin*, *supra*, 58 Cal.4th at p. 426; see §§ 21310-21315.) The new scheme abandons the former approach of using an " 'open-ended definition of [a] "contest," combined with a complex and lengthy set of exceptions,' " and instead limits the enforcement of no-contest clauses " 'to an express and exclusive list of contest types.' " (*Donkin*, *supra*, 58 Cal.4th at p. 426.) That list is set forth in section 21311, subdivision (a), which states: "A no contest clause shall only be enforced against the following types of contests: [¶] (1) A direct contest that is

4

brought without probable cause. [¶] (2) A pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application. [¶] (3) The filing of a creditor's claim or prosecution of an action based on it. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application." The new law also "discontinued the safe harbor declaratory relief procedure of former section 21320. [Citation.]" (*Donkin*, *supra*, 58 Cal.4th at pp. 426-427.)

The 2008 legislation went into effect on January 1, 2009, and became operative on January 1, 2010. (*Donkin*, *supra*, 58 Cal.4th at p. 426; see §§ 21310-21315.) The Legislature limited application of the current law to "any instrument, whenever executed, that became irrevocable on or after January 1, 2001." (§ 21315.)

## III.

## STATEMENT OF FACTS

**A. *Trust I***

**1. Trust Assets and Administration During the Lifetime of the Trustors**

On October 4, 1991, Maryon and Robert executed Trust I as a revocable trust, naming Robert as trustee and Peter as successor trustee. Assets of Trust I, all of which were deemed to be community property, consisted of property described in an attached "Schedule A," together with any later added property. Two categories of assets were listed on Schedule A: (1) a parcel of real property located in the Town of Hillsborough which the parties refer to herein as Robin Road; and (2) all furniture and furnishings in the Trustors' home on Robin Road.

During their joint lifetimes, the Trustors had full access to trust income and principal. "Immediately upon the death of either of the Trustors," the trust fund was to be divided into three subtrusts, designated Trust A, Trust B and Trust C. Trust A was to consist of the survivor's interest in the trust assets, while Trust B and Trust C were to hold some combination of the deceased trustor's interest in the assets. Under

5

Article VIII, Trust I was to become irrevocable after the death of either trustor, with one possible exception pertaining to Trust A that we discuss below.

During his or her lifetime, the survivor trustor was entitled to the entire net income of all three subtrusts, as well as "such sums out of the principal as the Trustee deem[ed] reasonably necessary for the Survivor's proper support . . . ."

## 2. Distribution of Trust A (Survivor Trust)

The distribution of the Trust A fund after the death of the survivor depended on whether Maryon or Robert died first. Article III, paragraph 4 provided that if Maryon was the survivor trustor, she would retain the right to revoke Trust A and to make any future provision for the distribution of the Trust A fund, but if the survivor was Robert, then "Trust A shall be irrevocable and no person shall have the power to alter amend, modify or revoke the same."

If Robert was the survivor trustor, the trust instrument gave him a limited power of appointment with respect to Trust A assets which was conferred by the following language in paragraph 6 of Article III:

"Upon the death of the Survivor, if the Trustor husband is the Survivor, Trust A shall terminate and the Trustee shall distribute and deliver the balance of Trust A then remaining (including both principal and any accrued or undistributed income) to such one or more natural persons from the class composed of the Trustor wife's son, PETER L. FUNSTEN, and the issue of PETER L. FUNSTEN living at the time of the death of the Survivor, and on such terms and conditions, either outright or in trust, as the Survivor appoints by his last valid will (whether admitted to probate or not) specifically referring to and exercising this limited power of appointment, whether such will is executed before or after the death of the first of the Trustors to die; provided, however, that the Trustee shall first pay out of the principal of Trust A any estate or inheritance tax attributable to Trust A by reason of the Survivor's death."

Article III, paragraph 6 further provided that if Robert failed to "effectively exercise" or only partially exercised his limited power of appointment, "any portion of Trust A not effectively appointed by the Survivor shall be distributed in accordance with

6

the provisions of Subparagraphs 8.1, 8.3 and 8.4 of this Article." As discussed below, those provisions pertain to the distribution of assets from Trust C.

### 3. Distribution of Trusts B and C (Decedent Trust)

The disposition of the assets from Trusts B and C, which consisted of the decedent trustor's interest in the Trust I assets, did not depend on which trustor was the first to die. In either case, after the death of the survivor, the two subtrusts were to be combined into Trust C and the resulting fund was to be distributed in accordance with the provisions of Article III, paragraph 8. Under those provisions, the deceased trustor's interest in (1) Robin Road was to be distributed to Peter (subparagraph 8.1); (2) the furniture and furnishings on the downstairs level of Robin Road was to be distributed to Peter (subparagraph 8.1); (3) the furniture and furnishings on the upstairs level of Robin Road was to be distributed to Maryon's daughter, Susan Meade Kennedy (Meade) (subparagraph 8.3); and (4) the balance of any funds was to be divided equally between Peter and Meade (subparagraph 8.4).[3]

### 4. The No-Contest Clause

Article X, paragraph 3 of the trust agreement stated, in pertinent part: "In the event that any beneficiary of this trust, singularly or in conjunction with any other person or persons, shall contest or in any manner attempt to defeat the validity of this trust or of the last will of either of the Trustors or shall undertake any legal proceeding that is designed to thwart the Trustors' wishes as expressed herein or to seek to obtain an adjudication in any proceeding in any court that this trust or any of its provisions or that such will or any of its provisions are void or seek otherwise to void, nullify or set aside this trust or any of its provisions or such will or any of its provisions, then the right of that person to take any interest given to him by this trust shall be void and this trust shall be administered as if that person had died without surviving issue before both of the Trustors."

---

[3] Subparagraph 8.2 of Article III provided for a cash payment from the Trust C fund to Maryon's son Reed Funsten, if he was then living. The record contains very little information about Reed, who plays no role in the current appeals.

7

### 5. The First Amendment

On January 12, 1994, Maryon passed away.  She was survived by Robert, who became the survivor trustor of Trust I and continued to act as its trustee.

On May 22, 1996, Robert executed a "First Amendment to Trust Agreement" (the First Amendment).  The First Amendment added paragraphs to the trust instrument which designate an additional successor trustee of Trust A.  While the original provisions of the Trust I agreement designated Peter as the successor trustee, and Peter's wife as an alternate successor trustee, the First Amendment provided that if Robert for any reason ceased to act as the trustee of Trust A, then Peter and his sister Meade would be cotrustees of Trust A.

### B. *Robert's Will*

On April 21, 2006, Robert executed the "Will of Robert Folger Miller."  In that instrument, Robert nominated Executors as the executors of his probate estate, exercised his limited power of appointment, and made other directives.  But, Robert did not use his will to make any gift from his probate estate.

### 1. Exercise of Limited Power of Appointment

In Article III of his will, Robert exercised his limited power of appointment under Trust I by directing that, upon his death, the Trust A fund was to be distributed and delivered in trust to the trustees of a new trust.  In Article III, paragraph 1, Robert designated Peter and Meade as cotrustees "to act together" to administer the new trust in accordance with paragraph 2, which stated:

"Upon my death, simultaneously with the distribution of the assets of Trust A under [Trust I] (including both principal and any accrued or undistributed income) to the Trustee[s] named in paragraph 1 of this Article, Trust A shall terminate and the Trustee[s] shall distribute and deliver the trust fund as then constituted to the beneficiaries named and in accordance with the provisions of subparagraphs 8.1 (as modified hereinbelow), 8.3 and 8.4 of Article III of the said Trust Agreement establishing [Trust I] . . . .  With respect to the provisions of subparagraph 8.1 of Article III of the said Trust Agreement establishing [Trust I], I intend that the gift of the furniture and

8

furnishings which were located on the downstairs level of my residence at [Robin Road], as of the date of the death of [Maryon], or the sale proceeds therefrom, be completely and fully satisfied by the distribution to [Peter] of the remaining items of such furniture and furnishings located on the downstairs level of my said residence at 101 Robin Road at my date of death together with the pecuniary gift to [Peter] under the provisions of . . . THE ROBERT FOLGER MILLER TRUST . . . ."

The validity and actual effect of Robert's limited appointment are not issues presented by these appeals. Nevertheless, it is useful to clarify here what Robert attempted to accomplish. First, he used his power to identify Meade as an additional trustee of the Trust A fund, notwithstanding that Peter was the only successor trustee named in Trust I. Second, Robert used his appointment power to direct a distribution of the Trust A fund to the beneficiaries named in paragraph 8 of Article III of Trust I rather than to one or more of the members of the class of Trust A beneficiaries set forth in paragraph 4 of Article III of Trust I. Third, Robert used his appointment power to amend Article III, subparagraph 8.1 of the Trust I instrument, notwithstanding the fact that Trust I had become irrevocable upon Maryon's death.

### 2. Disposition of Residue

In his will, Robert did not make a bequest or devise of any asset of his probate estate. Instead he directed that the residue of his estate was to be added to the trust fund of his personal trust, "THE ROBERT FOLGER MILLER TRUST" (hereafter the RFM Trust), and was to be distributed pursuant to the terms of that instrument.

### 3. No-Contest Clause

The no-contest clause, the longest part of Robert's will, began with this paragraph: "In the event that any beneficiary under this will . . . singularly or in conjunction with any other person or persons, contests or in any manner attempts to defeat the validity of [the RFM] Trust, this will or [Trust I] (as modified under the terms of this will or [the RFM] Trust) or undertakes any legal proceeding that is designed to thwart my wishes as expressed herein or in [the RFM] Trust or to seek to obtain an adjudication in any proceeding in any court that this will or any of its provisions or that [the RFM] Trust or

9

any of its provisions are void or seek otherwise to void, nullify or set aside this will or any of its provisions or [the RFM] Trust or any of its provisions, then the right of that person to take any interest given to him by this will shall be void and this will shall be administered as if that person had predeceased me without surviving issue."

The no-contest clause set forth a nonexclusive list of 18 possible actions that a will beneficiary might take which were "deemed" to be a violation of the no-contest clause, the third of which was described as follows: "3. Filing of any creditor's claim against my probate estate or against the trust fund of my [RFM] Trust (without regard to the validity of such claim), or prosecuting an action based upon such claim; acting in any adverse manner to a fiduciary in any action or proceeding to determine the character, title or ownership of trust property or property of my probate estate."

The no-contest clause closed with this additional provision: "Notwithstanding the provisions of California Probate Code Section 21300 et seq., or any successor statute thereto, it is my express intent that the foregoing no contest provision shall be construed in such manner as to give it its broadest and most expansive application. I acknowledge that under California Probate Code Section 21305(b), as amended from time to time, certain pleadings or actions are considered actions that are not in violation of a no contest clause as a matter of public policy, and to the extent any part of the foregoing no contest clause is considered such a proceeding, it is my intent further that such pleadings or actions be deemed by a court of competent jurisdiction to be a violation of the foregoing no contest clause if the court determines such pleadings or actions to be frivolous or unsuccessful. . . ."

C. *Robert's Trust*

As noted, Robert directed that the residue of his probate estate was to be distributed to the RFM Trust. In October 2007, Robert executed a final amendment and restatement of the trust agreement for the RFM Trust. According to that restated agreement, all assets of the RFM Trust were Robert's separate property. Robert named himself as trustee and Executors as his successor trustees. Beneficiaries of the RFM Trust included Robert's children, Therese and Paul, as well as Peter, Meade and others.

10

Robert's trust left Peter a cash gift of $150,000, which was conditioned on Peter accepting that gift along with any furniture from the Robin Road house that was distributed to him from Trust I as "full and complete satisfaction" of the gift of the furniture and furnishings from the downstairs level of Robin Road that was devised to Peter by Robert and Maryon in Trust I. Paragraph 3.3(c) of the RFM Trust agreement stated that if Peter were to make a claim against Trust I, the RFM Trust, or Robert's probate estate with respect to any furniture from Robin Road that was not available for distribution after Robert's death, then Robert's pecuniary gift to Peter "shall lapse and not be effective."

The RFM Trust agreement also contained a no-contest clause which provided for the invalidation of any gifts to any beneficiary who contested or attempted to defeat the validity of any provision of the RFM Trust, Robert's will, or Trust I as modified by Robert.

### D. *Peter's Safe Harbor Application*

Robert died on February 14, 2013. In May 2013, Robert's 2006 will was admitted to probate without objection, and Executors were appointed, also without objection.

On August 16, 2013, Peter filed an application in probate court, seeking an order that he would not violate the no-contest clause in Trust I by filing a petition for a judicial determination that he is the sole acting trustee of Trust I. Peter made his application pursuant to former section 21320.[4] He alleged that he was entitled to a safe harbor

---

[4] Former section 21320 states: "(a) If an instrument containing a no contest clause is or has become irrevocable, a beneficiary may apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary, . . . would be a contest within the terms of the no contest clause. [¶] (b) A no contest clause is not enforceable against a beneficiary to the extent an application under subdivision (a) is limited to the procedure and purpose described in subdivision (a). [¶] (c) A determination under this section of whether a proposed motion, petition, or other act by the beneficiary violates a no contest clause may not be made if a determination of the merits of the motion, petition, or other act by the beneficiary is required. [¶] (d) A determination of whether Section 21306 or 21307 would apply in a particular case may not be made under this section."

11

determination notwithstanding that former section 21320 was repealed in 2010 because Trust I became irrevocable in 1994 and the "current Probate Code only applies to instruments that became irrevocable after January 1, 2001." (Citing § 21315.)

The petition that Peter proposed to file alleged the following material facts: When Maryon died, the assets of Trust I included Robin Road, all of its furniture and furnishings, and cash and securities in accounts at Merrill Lynch and Dean Witter. Robert violated the trust agreement by withdrawing more than $5 million from Trust A, and Peter intended to file an action against Robert's estate to "redress" that breach of trust. Peter is the "duly appointed and acting Successor Trustee of Trust A within the Trust I trust agreement." Robert's attempts to amend the trust and to exercise his special power of appointment to add Meade as a cotrustee had no legal effect, but were efforts by Robert to prevent Peter from pursuing breach of trust claims against Robert's estate. With his prayer for relief, Peter intended to seek judicial declarations that he is the sole successor trustee of Trust A, and that Robert's First Amendment and exercise of his power of appointment were invalid. Peter also intended to request an order that if Meade was validly appointed, she be removed as successor trustee of Trust A.[5]

Executors opposed Peter's application, arguing that the relief requested in the proposed petition violated Trust I's no-contest clause, which explicitly prohibited a challenge of Robert's will.

At an October 8, 2013, hearing, the Honorable Steven L. Dylina advised the parties that the court had independently discovered that Peter had filed creditor's claims against Robert's probate estate while his safe harbor application was pending. The court provided a "sua sponte" advisory opinion that filing the creditor's claims likely violated the no-contest clause in Trust I. After further discussion, the court decided not to rule formally on that matter because it was not raised in the safe harbor application or any other pending petition, but the court opined that the creditors' claims raised a significant

---

[5] Peter inadvertently filed his petition at the same time he filed his safe harbor application. The probate court granted Peter relief from that filing mistake. This ruling is not an issue on appeal.

12

issue for a future petition. The parties then proffered opposing views on the substantive issue whether filing Peter's proposed petition would violate the Trust I no-contest clause. At the conclusion of the hearing, the court found that Peter's proposed petition would constitute a direct attack and a contest of Trust I.

On December 6, 2013, the court file a final order denying Peter's application under former section 21320 for a determination that his proposed petition would not constitute a contest of Trust I. The order incorporated the following finding: "[U]nder the broadly written no contest clause in the Miller Family Trust I dated October 4, 1991, the underlying Petition for Court Determination that Peter L. Funsten is Sole Acting Trustee of the Miller Family Trust I is a direct attack to the trust even under the prior no contest law applicable in 1994." (Italics omitted.)

### E. *Peter's Creditor's Claims*

As the probate court observed, Peter filed two creditor's claims against Robert's probate estate while his safe harbor application was pending. Those claims sought damages resulting from actions Robert allegedly took after Maryon's death in violation of his fiduciary duties as trustee of Trust I.

Peter's first claim sought damages for the withdrawal of all funds from two investment accounts that allegedly were assets of Trust I. In support of this claim, Peter outlined the following facts: In May 1993, Robert opened an investment account at Dean Witter Reynolds in his capacity as trustee of Trust I which was funded with stocks valued at more than $337,500. In June 1993, Robert opened another trust account at Merrill Lynch, Pierce, Fenner & Smith Inc., which was funded with cash and stock valued at more than $700,000. At the time of Maryon's death, the Merrill Lynch account contained approximately $2,898,697 in assets, and the Dean Witter account contained approximately $2,612,787.93 in assets. Thereafter, "despite the fact that Trust I became irrevocable after the death of his wife, Robert, having no authority whatsoever to do so, withdrew all of the assets from the Dean Witter Account on or about July 1994 and converted them for his own use." Also, Robert allegedly "withdrew all of the assets from the Merrill Lynch Account in or about October 1994 and converted them for his own

13

use." Thus, Peter alleged, "as a result of his actions, Robert breached his fiduciary duty as trustee of Trust I."

Peter's second creditor's claim sought damages for the loss of furniture and furnishings that were located on the lower level of Robin Road at the time of Maryon's death. Peter alleged that "Robert did not sell any of the downstairs level furniture and furnishings. Rather, during his lifetime, and without any authority, Robert gave away many of the downstairs level furniture and furnishings such that many valuable items are missing or have not been returned to Trust I." Peter further alleged on information and belief that "Robert converted the furniture and furnishings for his own use and breached his fiduciary duty as trustee of Trust I."

On December 17, 2013, Executors rejected both of Peter's claims "Entirely." Executors did not state any ground or provide any explanation for rejecting these claims.

**F.** *The Executors' Petition*

In January 2014, Executors filed a petition for an order that Peter had violated the no-contest clauses in Trust I and in Robert's will by filing the creditor's claims against Robert's probate estate. Executors argued that the provision in Robert's will which provides that the filing of a creditor's claim constitutes a contest is an enforceable no-contest clause under section 21311 of the current law. Furthermore, Executors' reasoned, Peter's decision to contest Robert's will was an express violation of the no-contest clause in Trust I.

In his opposition, Peter argued that this case is governed by the former no-contest law because section 21315 dictates that current law only applies to instruments that became irrevocable after January 1, 2001, and Trust I became irrevocable in 1994. Furthermore, according to Peter, under the former law any attempt to disinherit a beneficiary for alleging a breach of fiduciary duty by the trustee is void as against public policy.

On February 19, 2014, a hearing on Executors' petition was held before the Honorable George A. Miram. The court took the matter under submission, and, on March 13, 2014, it filed a 13-page order pursuant to which it granted in part and denied in

14

part Executors' petition for a declaration that Peter violated the no-contest clauses in Trust I and in Robert's will.

The court applied the current law to determine whether Peter's actions constituted a contest of Robert's will with the effect of voiding any interest that Peter acquired under that will. The court found that under section 21311, subdivision (a)(2), the will's no-contest clause created a valid forced election, pursuant to which Peter was required to choose between accepting what was bequeathed to him under the will or pursuing his creditor's claims, and by filing his claims Peter elected the latter course of action and forfeited his interests under the will. In reaching this conclusion, the court also found that, to the extent the current law continues to recognize a public policy exception for claims against a fiduciary, that exception would not apply to Robert's will because Robert was never a fiduciary of his own probate estate.

The court reached a different conclusion regarding the impact of the creditor's claims on Peter's status as a beneficiary of Trust I. The court found that the "plain wording of the no contest clause in Trust I . . . would appear to include the contest of [Robert's] will as a contest of Trust I for purposes of the no contest clause." However, the court also found that the trust's no-contest clause was not enforceable against Peter under the circumstances presented here. Applying the former law (because the trust became irrevocable prior to 2001), the court found that former section 21305 codified a common law policy which protects beneficiaries from disinheritance for challenging the actions of a fiduciary. The court concluded that this policy protected Peter from being disqualified as a beneficiary of Trust I based on the filing of creditor's claims which alleged a breach of fiduciary duty by the trustee of Trust I.

In accordance with the findings summarized above, the March 2014 order ends with this conclusion: "[T]his court finds that while [Peter] has engaged in conduct that constitutes a contest under the terms of the no contest clause in [Robert's] will, Peter . . . has not engaged in conduct that constitutes a contest under the terms of the no contest clause in Trust I." The probate court incorporated its March 2014 order into a final judgment which was filed on May 9, 2014.

15

# IV.

# DISCUSSION

## A. *Standard of Review*

These consolidated cases present three rulings for our review: the denial of Peter's safe harbor application; the finding that Peter's creditor's claims violate the no-contest clause in Robert's will; and the finding that Peter's creditor's claims do not violate the no-contest clause in Trust I.

The parties agree our standard of review is de novo. " 'The standard of review where the applicability of a no contest clause is at issue and there are no disputed facts is de novo.' [Citation.]" (*Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, 1068.) Furthermore, the interpretation of a statute is also a question of law subject to independent review on appeal. (*Ibid*.; *Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1138.)

## B. *Peter Was Not Entitled to a Safe Harbor Ruling*

In his first appeal, Peter contends that the denial of his safe harbor application must be reversed because the former law applies to the no-contest clause in the Trust I instrument, and the probate court committed legal error by concluding that Peter's proposed petition constituted a contest of the trust under the former law. We do not reach the merits of this claim because we conclude that Peter was not entitled to a safe harbor ruling under the circumstances presented here.

As noted above, Peter's August 2013 safe harbor application was filed under former section 21320, a statute that was repealed on January 1, 2010, and was not replaced with a new law authorizing a safe harbor procedure. Thus, the threshold question is whether this former statute was available to Peter in this case. Executors raise this issue in their respondents' brief. In reply, Peter argues that the former safe harbor statute is available to obtain an advisory opinion on any issue arising under the former no-contest law. We disagree.

Our starting point is section 3, the general statute governing the "applicability of changes to the Probate Code." (*Rice v. Clark* (2002) 28 Cal.4th 89, 99.) Section 3,

subdivision (c) states: "Subject to the limitations provided in this section, a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action." "The manifest purpose" of section 3 is "to make legislative improvements in probate law applicable on their operative date whenever possible . . . ." (*Rice v. Clark*, *supra*, 28 Cal.4th at p. 99.)

As noted in our overview of the law, an important improvement in probate law accomplished by the 2008 legislation was the reduction in litigation by beneficiaries that resulted from the elimination of the safe harbor procedure. (*Donkin*, *supra*, 58 Cal.4th at pp. 424-426.) Thus, interpreting the current law to eliminate the right to file a safe harbor application after the operative date of the current law would advance the legislative purpose of section 3. However, as the statutory language of section 3 reflects, the general rule in favor of retroactive application of a Probate Code statute is subject to exceptions, and Peter contends two of these exceptions are applicable here.

Section 3, subdivision (b) states that "[t]his section governs the application of a new law except to the extent otherwise expressly provided in the new law." Here, the new no-contest law includes section 21315, which expressly provides that "[t]his part applies to any instrument, whenever executed, that became irrevocable on or after January 1, 2001," but that it "does not apply to an instrument that became irrevocable before January 1, 2001." Thus, notwithstanding section 3, subdivision (c), the current no-contest law applies only to instruments that became irrevocable after January 2001, and the former law on this subject applies to instruments that became irrevocable before that date.

However, Peter erroneously assumes that section 21315 also establishes that the safe harbor procedure is still available to beneficiaries who seek rulings regarding the enforceability of no-contest clauses under the former law. Section 21315 addresses the question of what law applies to an *instrument*. Peter's safe harbor application is not an

17

instrument, but a pleading (i.e., a procedural device) that he filed under a statute that had already been repealed. Because Peter's application is not an instrument, section 21315 is inapposite.

Peter also attempts to invoke section 3, subdivision (g), which states: "If the new law does not apply to a matter that occurred before the operative date, the old law continues to govern the matter notwithstanding its amendment or repeal by the new law." By its clear terms, section 3, subdivision (g) applies to "a matter" if (1) the new law does not apply to that matter, *and* (2) that matter "occurred" before the operative date of the new law. A safe harbor application satisfies the first prong of this exception because the new no-contest law does not apply to safe harbor applications. However, Peter's safe harbor application did not "occur" before the operative date of the new law; Peter filed his application more than three years after the operative date of the current no-contest law. Thus, section 3, subdivision (g) did not authorize the probate court to reach the merits of Peter's safe harbor application in this case.

*Donkin*, *supra*, 58 Cal.4th 412 is instructive. That case involved a family trust established by husband and wife in 1988. (*Id.* at p. 415.) Husband died first. Shortly before wife's death in 2005, she executed a trust amendment which changed the allocation of trust assets after her death. Both the trust instrument and its amendment contained no-contest clauses. (*Id.* at p. 418.) In 2009, beneficiaries filed an application under former section 21320, for a safe harbor ruling regarding the effect of a proposed petition to compel the immediate distribution of trust assets pursuant to the allocation set forth in the original trust instrument. (*Id.* at pp. 419-420.) When the new no-contest law became operative in January 2010, the safe harbor application was still pending. (*Ibid.*) The probate court and Court of Appeal addressed the merits of the application, accepting the parties' theory that a safe harbor ruling was available because the former law applied to the trust instrument. (*Id.* at p. 421.) However, when the Supreme Court granted review, it implicitly rejected that theory.

Before reaching the merits of the case, the *Donkin* court addressed the preliminary question whether the trial court erred "as a procedural matter" by ruling on the safe

18

harbor application after the operative date of the 2008 legislation. (*Donkin*, *supra*, 58 Cal.4th at p. 427.) To answer that question, the court applied section 3. It considered the general rule that " 'a new law applies on the operative date to all matters governed by the new law,' " and it also observed that under section 3, subdivision (d), even when a petition is filed before the operative date of a new law, " 'any subsequent proceedings taken after the operative date concerning the petition . . . is governed by the new law and not by the old law.' " (*Donkin*, at p. 427, original italics.) However, these rules did not answer the question before the court because a safe harbor application is a "matter" that is not governed by the new law and because the new law does not provide that an already pending safe harbor application would be subject to dismissal after the operative date of the new law. (*Ibid*.)

Ultimately, the *Donkin* court found its answer in section 3, subdivision (g) which, as discussed above, authorizes application of a repealed statute " '[i]f the new law does not apply to a matter that occurred before the operative date.' " Since the *Donkin* beneficiaries filed their application *before* the operative date of the new legislation that repealed the safe harbor statute, the court found that "the cause was properly before the probate court" under section 3, subdivision (g). (*Donkin*, *supra*, 58 Cal.4th at p. 427.)

The *Donkin* court went on to conduct a separate inquiry to determine what substantive no-contest law applied to the trust instrument in that case. (*Donkin*, *supra*, 58 Cal.4th at p. 428.) To answer that question, the court applied section 21315, which, as discussed above, limits the retroactive application of the current no-contest law to instruments that became irrevocable on or after January 1, 2001. (*Donkin*, at p. 432.) Under that statute, the court found that the current law presumptively applied because the trust instrument became irrevocable after January 1, 2001. (*Ibid*.)

*Donkin* confirms our conclusion that the propriety of a safe harbor application is a procedural issue which must be resolved independently of the question regarding what substantive law governs the enforceability of the underlying no-contest clause. Indeed, in *Donkin*, the trust beneficiaries were entitled to a safe harbor ruling under section 3, subdivision (g) notwithstanding the fact that the current no-contest law applied to the

19

trust instrument at issue in that case. In this case, unlike *Donkin*, Peter's safe harbor application was not filed before the operative date of the new law. Thus, neither the section 3, subdivision (g) exception nor any other rule we have found authorized Peter to file his application under a statute that no longer exists.

Under these circumstances, the trial court erred by reaching the merits of Peter's safe harbor application. Instead, the application should have been dismissed or denied outright.

## C. *Peter's Actions Did Not Constitute a Contest of Robert's Will*

Peter's second appeal is from the part of the May 2014 judgment which holds that he violated the no-contest clause in Robert's will. As discussed, the trial court found that the current probate law applies to the no-contest clause in Robert's will and, under that law, Peter violated an enforceable provision of the no-contest clause which characterizes the filing of a creditor's claim as a contest of the will.

### 1. Governing Law and Issues on Appeal

Robert's will became irrevocable when he died on February 14, 2013. Thus, the parties agree that the enforceability of the no-contest clause in that instrument is governed by the current law. (§ 21315.)[6] However, the parties offer very different theories about how current law should be applied to the no-contest clause in Robert's will.

We find in unnecessary to resolve most of these disagreements because we conclude that Peter was not a beneficiary of Robert's will. Regardless how the no-contest clause is interpreted and enforced, Peter could not have violated that clause because he is not a will beneficiary. (§ 21310, subd. (c) [" 'No contest clause' means a

---

[6] Section 21315 creates a presumption regarding the applicability of the current law to instruments that became irrevocable after January 1, 2001, which is subject to a "fairness" exception codified in section 3, subdivision (h). (*Donkin*, *supra*, 58 Cal.4th at pp. 432-433.) That exception applies when "a party can show that a different result would obtain under the former law on which the transferor relied when executing the estate plan." (*Id*. at p. 433.) Here, neither party invokes this fairness exception.

provision in an otherwise valid instrument that, if enforced, would penalize a beneficiary for filing a pleading in any court."].)

Although the parties appear to underestimate the significance of this issue, they both address it. Peter contends that he is not a beneficiary of Robert's will because that instrument did not confer any gift on him that he could be forced to forfeit by electing to pursue a contest.[7] Executors respond that Peter is a beneficiary of Robert's will because Robert used that instrument to (1) make Peter a monetary gift of $150,000; and (2) exercise his limited power of appointment under Trust I to make Peter a beneficiary of the Trust A fund. We will separately consider Executors' two theories, neither of which establishes that Peter is a beneficiary of Robert's will.

## 2. Robert Did Not Give Peter a Monetary Gift in His Will

As reflected in our factual summary, the RFM trust created a conditional monetary gift to Peter in the amount of $150,000. The RFM Trust is not a component of Robert's will. That trust is governed by its own trust agreement with its own no-contest clause. Thus, Robert's monetary gift makes Peter a beneficiary of the RFM Trust, not of Robert's will.

Executors posit that Robert's $150,000 gift makes Peter a beneficiary of Robert's will because the will itself contains an expression of Robert's "intent" that Peter's interest in the Robin Road downstairs furniture and furnishings would be "completely and fully satisfied" by the remaining items of such furniture and furnishings that were distributed to him from the Trust I estate along with the gift of $150,000 from the RFM Trust. But Executors provide no explanation as to how Robert's decision to express this desire in his will alters the legal nature of the monetary gift from the RFM Trust. The relevant and undisputable fact is that Robert did not make Peter any monetary gift from his will.

---

[7] Peter contends that he is aggrieved by this part of the judgment even though he has nothing to lose under the will because Executors intend to use the judicial finding that Peter violated the will's no-contest clause to "effectively" disinherit him from receiving the Trust A fund. Executors do not dispute that this is their plan.

21

Executors contend that "[b]ecause [Trust I], the RFM Trust, and the Will are parts of an integrated estate plan, the gift of $150,000 under the RFM Trust was equally a gift under the Will." This contention fails for at least two reasons.

First, the record does not support the characterization of these three instruments as a single integrated estate plan. Trust I was a joint estate plan created by Robert and Maryon to provide for the disposition of certain community property assets, primarily the Robin Road home and its contents. The joint intent expressed in that instrument was that, after the death of both Trustors, Peter and/or his issue would take that home and the downstairs furniture and furnishings, and that Meade would take half or perhaps all of the upstairs furniture or furnishings. To effectuate that joint plan, the couple agreed to limit Robert's power as the potential Survivor Trustor by making the trust irrevocable upon Maryon's death and by giving Robert only a special appointment power over the Trust A fund, which limited the pool of potential appointees to Peter and his issue.

Unlike Trust I, the RFM Trust and Robert's will were part of Robert's separate and fundamentally different estate plan. Regardless of whether Robert's separate plan can be reconciled with the joint plan he agreed to in the Trust I instrument, Robert was not effectuating the joint intention of the trustors of Trust I by exercising his limited power of appointment to distribute any part of the Trust A fund to anyone other than Peter or his issue.

Second, Executors fail to support their legal conclusion that "the gift of $150,000 under the RFM Trust was equally a gift under the Will." Their apparent theory is that the provision in the will providing for the pouring over of the residue of Robert's estate into the RFM Trust created an integrated estate plan pursuant to which the $150,000 gift made Peter a devisee under the will as well as the trust. This unsupported theory is inconsistent with section 34, which states: "(a) 'Devisee' means any person designated in a will to receive a devise. [¶] (b) In the case of a devise to an existing trust or trustee, or to a trustee on trust described by will, the trust or trustee is the devisee and the beneficiaries are not devisees." Under this provision, Robert devised the residue of his probate estate to the trustees of the RFM trust, not to the ultimate beneficiaries of that trust.

22

### 3. Robert's Exercise of His Limited Power of Appointment Did Not Make Peter a Beneficiary of Robert's Will

Executors contend that Robert named Peter as a beneficiary of his will by using that instrument to exercise his limited power of appointment to designate Peter as a beneficiary of the Trust A fund.

#### a. *Legal Principles*

"A power of appointment is a power given by the donor of property to the donee, which enables the donee to designate the persons (appointees) who are to take the property at some future time. [Citations.]" (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 145, p. 202.)[8] "A power of appointment can be created only by a donor having the capacity to transfer the interest in property to which the power relates." (§ 620.) The donee is the "person to whom the power of appointment is given or in whose favor a power of appointment is reserved" according to the terms of the instrument in which the power is created. (§ 610.)

A power of appointment is "general" if it exercisable in favor of the donee, the donee's estate or his creditors. (§ 611.) All powers which are not general are "special." A "special" power (i.e. a limited power) "is one that permits the donee to appoint to a class that does not include the donee, the donee's estate, the donee's creditors, or the creditors of the donee's estate. [Citations.]" (Witkin, *supra*, Real Property, § 149, p. 206; see also § 611.)

Thus, the donee of a general power of appointment, who essentially retains ownership of the subject property, may appoint the property to his estate, to be administered and distributed according to his will. But when a donee exercises a special power of appointment by disposing of the corpus of a trust in his will, "the persons appointed by the donee take directly from the trustees and not through the estate of the

---

[8] Rules governing the use of powers of appointment are partially codified in the Power of Appointment Act. (§§ 600 et seq.) If an issue is not addressed in the statute, then California follows the common law as developed in pertinent case decisions. (§ 600; *Estate of Rosencrans* (1971) 4 Cal.3d 34, 39.)

donee of the power. [Citations.]" (*Estate of Masson* (1956) 142 Cal.App.2d 510, 512 (*Masson*); see also *Estate of Baird* (1955) 135 Cal.App.2d 333, 340-341 (*Baird*).)

Furthermore, "[i]f the donee of a discretionary power of appointment fails to appoint the property, releases the entire power, or makes an ineffective appointment, in whole or in part, the appointive property not effectively appointed passes to the person named by the donor as taker in default or, if there is none, reverts to the donor." (§ 672.) Under this rule, which is a codification of the common law, "the property passes directly from the donor to the ultimate takers.' [Citations.]" (*Sefton v. Sefton* (2015) 236 Cal.App.4th 159, 173.)

**b.** *Analysis*

These principles establish that the Trust A fund was never an asset of Robert's probate estate. As donors, Robert and Maryon created a testamentary special power of appointment with respect to the Trust A fund in Article III, paragraph 6 of the Trust I instrument. Robert was the donee of that special power, and, to the extent Robert validly exercised that appointment power, the person(s) appointed by him took directly from the trustee of Trust I and not through Robert's probate estate. (*Masson*, *supra*, 142 Cal.App.2d at p. 512; *Baird*, *supra*, 135 Cal.App.2d at pp. 340-341.) To the extent Robert's appointment was invalid or ineffectual, the Trust A fund would pass to the persons that were named in Trust I as the takers in default. (§ 672.) However, in no event would the Trust A fund have become an asset of Robert's probate estate. Thus, Robert could not have made Peter a beneficiary of his will simply by using that will to exercise his limited power of appointment over a Trust I asset.

Executors contend that when Robert exercised his limited power of appointment, he "direct[ed] the distribution and delivery of his survivor's interest in the trust assets— his own property." Even if correct this conclusion does not advance respondent's position because (1) once Maryon passed away, the trust became irrevocable and (2) Robert's reserved power over the survivor's trust was a *limited* or special power of appointment. Thus, Robert did not have the power as either a trustor or a donee of the Trust A fund to transfer that Trust I asset to himself or to his own probate estate.

24

Executors argue that in exercising his appointment power to direct the distribution of assets from his survivor's trust to Peter and Meade, Robert made a gift to Peter, i.e., "a 'transfer of . . . property made voluntarily and without consideration'." (Quoting 35 Cal.Jur.3d Gifts § 1 (Westlaw 2015).) However, as our summary of the pertinent law reflects, the gift was made from the trustors of Trust I, it was not made by the donee of a special power of appointment or from that donee's probate estate. The fact that Robert was one of the original donors of the Trust A fund does not alter the legal nature of the special power of appointment that he subsequently exercised in his will. As a matter of law, the exercise of that special appointment power was not a gift to Peter from Robert's probate estate.

In concluding that Peter engaged in conduct that constitutes a contest under the no-contest clause in Robert's will, the probate court reasoned that Robert's will presented Peter with "the forced election of either accepting the share of such assets bequeathed to [Peter] under the terms of [Robert's will] or pursing the creditor's claims, recovering the assets belonging to the trust, and then taking the share of such assets bequeathed to [Peter] under the terms of Trust I." However, the probate court did not find that Robert actually bequeathed anything to Peter in the will, nor did it even consider that question.

Since Peter was not a beneficiary of Robert's probate estate, he did not violate the no-contest clause in Robert's will as a matter of law. In light of this fact, the probate court erred by granting the part of the Executors' petition requesting an order that Peter violated the no-contest clause in Robert's will.

**D.  *Peter's Actions Did not Constitute a Contest of Trust I***

Finally, we turn to Executors' cross-appeal from the part of the judgment which holds that Peter did not violate the no-contest clause in Trust I by filing creditor's claims against Robert's probate estate. As discussed, the probate court found that (1) Peter took an action which constituted a contest of Robert's will and (2) a contest of Robert's will also constitutes a contest of the trust. However the court concluded that, under the former law applicable to the Trust I instrument, the trust's no-contest clause could not be enforced against Peter for challenging the actions of a fiduciary.

25

### 1. Executors Have Standing

Preliminarily we address Peter's contention that Executors do not have standing to prosecute their cross-appeal because they have no interest in the administration of Trust I. "Standing to appeal is jurisdictional [citation] and the issue of whether a party has standing is a question of law [citation]." (*People v. Hernandez* (2009) 172 Cal.App.4th 715, 719.) To "have appellate standing, one must (1) be a party and (2) be aggrieved. [Citations.]" (*In re Marriage of Burwell* (2013) 221 Cal.App.4th 1, 12-13; see also Code Civ. Proc., § 902 ["Any party aggrieved may appeal in the cases prescribed in this title."].) Here, Peter contends that the only parties potentially aggrieved by the part of the May 2014 judgment pertaining to Trust I are the beneficiaries or successor trustees of Trust I, i.e., Peter or Meade. We disagree.

In *Estate of Goulet* (1995) 10 Cal.4th 1074, 1080, our Supreme Court held that "[c]onsiderations of law and policy lead us to conclude a trustee must be permitted to appeal an order determining a trust beneficiary's proposed claim would not violate a trust's no contest clause." (Fn. omitted.) The court reasoned that affording trustees standing under these circumstances ensures that the trustor's intent is not left undefended. It also found that a trustee is "aggrieved" for purpose of standing because, like a personal representative of an estate, the trustee has fiduciary duties to protect and defend the trust corpus which are adversely affected by an order that a proposed action by a beneficiary would not constitute a contest. (*Id*. at pp. 1082-1083.)

By a parity of reasoning, Executors have standing in this case because this part of the judgment exposes Robert's probate estate to potential liability. Executors are aggrieved by the probate court's finding that Peter was not disinherited from the trust because that finding permits Peter to pursue claims against Robert's probate estate arising out of Robert's administration of the trust, and thus implicates Executors' ongoing fiduciary duties to protect the assets of Robert's probate estate.

Peter filed his creditor's claims as the beneficiary of Trust I. If, as Executors contend, Peter's conduct did constitute a contest of the trust, then Peter would no longer be a trust beneficiary, and would not be able to pursue his damages claims against

26

Robert's probate estate. Thus, as the executors of the trustee's probate estate, Executors have standing to appeal an order that preserves Peter's rights as a beneficiary of the trust estate.

## 2. Governing Law and Issues Presented

Trust I became irrevocable on January 12, 1994, when Maryon died. Thus, the parties agree that the enforceability of the no-contest clause is governed by the former law. (§ 21315; *Donkin*, *supra*, 58 Cal.4th at pp. 432-433.) Once again though, they disagree about whether the probate court correctly applied that law.

In conducting our review of this part of the judgment, we will focus our analysis on two material findings that the probate court outlined in its March 2014 order: (1) under the "plain wording" of Trust I, the filing of Peter's creditor's claims constituted a contest of the trust; (2) under the former law, the no-contest clause in Trust I could not be enforced against Peter for filing creditor's claims which challenge the actions of a fiduciary. As we will explain, we disagree with the first finding, but we agree with the second.

## 3. The Creditor's Claims Did Not Constitute a Contest

Under the former law, and today, no-contest clauses are strictly construed. (Former § 21304; *Donkin*, *supra*, 58 Cal.4th at p. 422.) At the same time, however, the intentions of the drafter control such that a court will not rewrite an instrument to immunize a legal proceeding that was clearly designed to frustrate the expressed intention of the trustor or testator. (*Betts v. City National Bank* (2007) 156 Cal.App.4th 222, 232 [" ' "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." ' [Citation.]"].)

In this case, the no-contest clause in the Trust I instrument characterizes the following actions by a trust beneficiary as a contest: (1) any attempt to defeat the validity of the trust or the last will of either Trustor; (2) any legal proceeding which is designed to "thwart" the wishes of the Trustors as expressed in the trust instrument; (3) any court proceeding which seeks an adjudication that any provision in the trust or either Trustor's

27

will is void; (4) or any other attempt to void, nullify or set aside any provision of the trust or either will.

Notably, the trust instrument uses different substantive language to describe actions directed at the trust which constitute a contest than it uses to describe actions taken against a will which constitute a contest. With respect to the trust itself, any action which either seeks to invalidate a trust provision or to thwart an expressed wish of the trustor is deemed to be a contest. By contrast, with respect to the will of either trustor, only actions by a trust beneficiary which attempt to invalidate a provision in a will are characterized as a contest of the trust. Thus, in analyzing whether Peter's actions constituted a contest of the trust, it is important to separately consider the impact of his conduct on the trust and on the will.

Peter's creditor's claims sought damages for actions that Robert allegedly took in his capacity as trustee of Trust I. They did not challenge the validity of any provision of the trust instrument that established Trust I. Nor were they designed to thwart any wish expressed by the Trustors in their trust agreement. Indeed, Peter's claims (whether valid or not) were explicitly intended to protect the trust, not to undermine it. Thus, Peter's conduct did not fall within provisions of the no-contest clause that sought to disinherit a beneficiary for attempting to defeat the trust or thwart the Trustors' wishes. (See, e.g., *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604 [proposed petition did not constitute a contest of the trust's no-contest clause when the trust provisions would remain unchanged and in full effect whether or not the petition was granted].)

Nor did Peter's claims fall within provisions of the trust's no-contest clause that characterize an attempt to invalidate a trustor's will as a contest of the trust. Peter's creditor's claims had nothing to do with the validity of Robert's will. Rather, Peter sought damages from Robert's probate estate for the allegedly wrongful removal of assets from Trust I. By making those claims, Peter was not attempting to nullify, void or invalidate any substantive provision of the will itself; the claims do not challenge Robert's nomination of his executors, exercise of his limited power of appointment, or

28

disposition of his assets. Thus, filing creditor's claims against Robert's probate estate was not an attempt to invalidate a provision of Robert's will.

Executors contend that Peter's conduct did constitute a contest of the trust because the "Trust's no contest clause makes a contest of the Will a contest of the Trust." This argument begs the question of what constitutes a "contest of the Will." The no-contest clause in Robert's will is much broader than the no-contest clause in the Trust I instrument and, indeed, explicitly uses the act of filing of a creditor's claim against Robert's probate estate as an example of a contest. However, the question we address in this part of our discussion is not whether Peter's conduct constituted a contest under the will's definition of a contest, but rather whether it constituted a contest under the trust's no-contest clause. As we have explained, the creditor's claims did not seek to invalidate any provision of Robert's will, and thus did not constitute a contest of that will under the trust instrument's definition of a contest.

Evidently, the probate court was persuaded that filing a creditor's claim falls within the provision of the trust's no contest clause because Robert's will characterizes the filing creditor's claim as a contest of his will. That was error. The Trust I instrument does not incorporate the will's no contest clause by reference. Indeed, an attempt to incorporate a future document into the trust would have been ineffectual. (*Simon v. Grayson* (1940) 15 Cal.2d 531, 533.) Furthermore, Robert could not have used his will to materially alter the definition of a contest that was set forth in the Trust I instrument. As discussed above, Trust I became irrevocable when Maryon died. Thus Robert was without capacity to retroactively expand the scope of the no-contest clause in the trust to punish conduct that was not characterized as a contest under the language of the trust instrument itself.

In their reply brief, Executors argue that even though the trust no-contest clause does not expressly state that the filing of a creditor's claim against Robert's estate would be a contest, Peter's actions constituted a trust contest because his objective in filing creditor's claims was contrary to the trustors' intent. According to Executors, the trust instrument itself clearly expresses that it was the intention of Robert and Maryon to

condition Peter's receipt of "their generous gift . . . on his compliance with their wishes as expressed in . . . their wills."  But, as discussed, that is not what the trust instrument stated.  The trustors disavowed conduct that conflicted with their *joint wishes* as expressed *in* the trust instrument, but they did not purport to invalidate a gift to a trust beneficiary who opposed any wish that one of them might express in a future will.

In their reply brief, Executors also advocate for a broad construction of the trust clause under which *any* act which can be construed as a contest of Robert's will automatically constitutes a contest of the trust as well.  This argument fails for two reasons.  First, no-contest clauses are construed narrowly, and here the trust instrument's definition of a will contest was limited to actions which seek to invalidate a provision in the final will of a trustor.  Second, as discussed earlier, Peter was not a beneficiary of Robert's will and thus nothing he did constituted an actual contest of that will.

### 4. Disinheriting Peter Would Violate Public Policy

Even if filing a creditor's claim against Robert's probate estate could be construed as a contest of the trust itself, such a provision in the Trust I instrument would not be enforceable against Peter under the circumstances presented here.

Under the former law, a provision in a trust which purports to disqualify a beneficiary for challenging a trustee's breach of fiduciary duty was unenforceable as against public policy.  (*Fazzi v. Klein* (2010) 190 Cal.App.4th 1280, 1289 (*Fazzi*); see, e.g., *Estate of Ferber* (1998) 66 Cal.App.4th 244, 253 (*Ferber*) ["[n]o contest clauses that purport to insulate executors completely from vigilant beneficiaries violate" public policy]; see also *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1213-1214 (*Hearst*).)  Applying this former law here, the no-contest clause in Trust I was not enforceable to the extent it purported to penalize Peter for pursuing a breach of fiduciary duty claim against the trustee of Trust I.

On appeal, Executors concede that the former law did impose some limits on the enforcement of a no-contest clause against a beneficiary for bringing a challenge to the conduct of a fiduciary.  But, under Executors' interpretation of the former law, disinheriting Peter from Trust I because of his creditor's claims would not offend public

policy because his claims were "legally insufficient" to establish that Robert actually breached any fiduciary duty.

As discussed in our overview of the law, prior to the enactment of the 2008 legislation, the no-contest law was in flux. During that period, some courts drew a distinction between frivolous and nonfrivolous challenges to the acts of a fiduciary. (See, e.g., *Ferber*, *supra*, 66 Cal.App.4th at p. 253; see also *Hearst*, *supra*, 145 Cal.App.4th at pp. 1213-1214 [applying *Ferber*].) These courts reasoned that a beneficiary should not be able to undermine the wishes of a trustor, as expressed in a no-contest clause, by making a frivolous claim against a fiduciary. (*Ibid.*)

This distinction between frivolous and nonfrivolous challenges to the act of a fiduciary was eliminated in 2000, when the Legislature enacted former section 21305. As also noted in our overview, former section 21305, subdivision (b)(6) provided that, "[n]otwithstanding anything to the contrary in any instrument, the following proceedings do not violate a no contest clause as a matter of public policy: . . . A petition challenging the exercise of a fiduciary power."

Former section 21305 applied only to instruments that became irrevocable on or after January 1, 2001. (Former § 21305, subd. (d); *Hermanson v. Hermanson* (2003) 108 Cal.App.4th 441, 445-446.) Thus, one could argue this former statute does not apply to our analysis of Trust I because that instrument became irrevocable in 1994. We note however, that at least one court has found that the reason the Legislature added former section 21305, subdivision (b)(6) was because it believed that "the courts were guilty of making overly broad applications" of no-contest clauses, and this statute would "make it clear that '[a] pleading challenging the exercise of a fiduciary power' was excluded." (*Bradley v. Gilbert*, *supra*, 172 Cal.App.4th at p. 1070.)

In any event, putting aside former section 21305, subdivision (b)(6), the pertinent case law does not support Executors' theory that the common law policy authorizing a beneficiary to challenge the acts of a fiduciary only applied to claims that were "legally sufficient."

31

In *Ferber*, a will beneficiary sought a safe harbor determination that a proposed petition to remove the executor of the decedent's estate would cause the beneficiary to be disinherited. (66 Cal.App.4th at pp. 248-249.) After determining that the proposed action contravened an express provision of the will's no contest clause, the *Ferber* court focused its analysis on whether the clause itself was valid and enforceable. (*Id*. at pp. 250-251.) To resolve that issue, the court balanced the competing policies. On the one hand, the court recognized, "[n]o contest clauses that purport to insulate executors completely from vigilant beneficiaries violate the public policy behind court supervision." (*Id*. at p. 253.) Indeed, the court found, even a no contest clause that provides for forfeiture only if the beneficiary is unsuccessful "casts much too great of a chilling effect on beneficiaries." (*Id*. at p. 254.) On the other hand, however, California has long embraced a policy favoring the enforcement of no-contest clauses. (*Ibid*.) To accommodate both sets of policies, the *Ferber* court held that it would enforce "no contest clauses against beneficiaries who attempt to oust the executor with a frivolous challenge." (*Ibid*.)

Subsequent cases applied *Ferber*'s frivolous challenge standard when determining whether a no-contest clause could be used to disqualify a beneficiary for challenging the conduct of a fiduciary. (See, e.g., *Fazzi*, *supra*, 190 Cal.App.4th at p. 1289 [" 'no-contest' clauses barring removal actions are enforceable only as to frivolous attempts to oust an executor or trustor"]; *Hearst*, *supra*, 145 Cal.App.4th at pp. 1213-1215 [applying *Ferber*'s frivolous challenge test to conclude that proposed claims would constitute a will contest].) However, none of these cases support Executors' theory that a beneficiary could be disinherited for challenging the actions of a fiduciary unless he overcame some ill-defined procedural hurdle by making a showing that his challenge was "legally supportable."

Executors' factual analogy to *Hearst*, *supra*, 145 Cal.App.4th 1195 is also unsound. That case was an appeal from an order denying beneficiaries' application for a safe harbor determination that they would not be disinherited if they filed a proposed petition alleging that trustees breached their fiduciary duties by favoring remainder

32

beneficiaries over income beneficiaries. In the proposed petition, the beneficiaries alleged that conduct which was expressly authorized by the trust instrument constituted a breach of fiduciary duty without providing any legal support for their position. Applying the *Ferber* test, the *Hearst* court affirmed a ruling that the proposed petition would constitute a contest because the proposed claims clearly implicated the no-contest clause and the undisputed facts established that the trustees did not breach their fiduciary duties as a matter of law. (*Id*. at p. 1214.)

In contrast to *Hearst*, in this second appeal we do not evaluate the legal implications of a beneficiary's proposed course of action. The issue here is whether the former law protected Peter's right to challenge the actions of a fiduciary without risking disinheritance by filing a creditor's claim against that fiduciary's estate. The filing of such a claim is a statutory prerequisite to obtaining any relief from Robert's estate; failure to timely comply with the claim filing requirement bars a subsequent court action. (§§ 9000-9002; *Wilkison v. Wiederkehr* (2002) 101 Cal.App.4th 822, 833-834.) Thus, in our view, the act of filing of a creditor's claim is not susceptible to the same frivolous challenge test established in *Ferber* and applied in *Hearst*.[9]

Furthermore, Peter's claims are qualitatively different than the proposed petition that was analyzed by the *Hearst* court. The *Hearst* petition was based on a "bare allegation" that the trustees breached their fiduciary duties, notwithstanding that the challenged actions were expressly authorized by the trust instrument. (*Hearst*, *supra*, 145 Cal.App.4th at pp. 1201-1202, 1211.) Here, by contrast, Peter's claims were supported by allegations that Robert took assets from the Trust I estate in violation of the trust agreement and his fiduciary duty, and that he used those assets for an improper purpose, causing measurable damage to the trust estate. Since Executors denied Peter's claims without explanation, the probate court was willing to assume they were valid. Although

---

[9] In retrospect, *Ferber* and its progeny can be viewed as a response by the courts to a perceived misuse of the safe harbor procedure by litigious beneficiaries. The judgment at issue in this second appeal has nothing to do with that safe harbor procedure.

we need not go that far, this record does not support the conclusion that Peter's claims were frivolous.

Belatedly, Executors contend that Peter's claims were indeed frivolous. First, they argue that Robert removed funds from trust accounts because they were his separate property, which he only mistakenly placed in the trust to begin with. To support this new theory, Executors rely on evidence that was not before the probate court that decided this petition. That evidence has no bearing on our review of the appealed judgment.

As for Peter's second claim pertaining to the missing furniture from Robin Road, Executors point out that the Trust I instrument authorized Robert to sell those assets so long as he gave the proceeds to Peter or his issue. Executors then postulate that Peter would have to prove that a $150,000 gift that Robert made to Peter was inadequate to cover any missing furniture. However, Peter alleged that Robert did not sell the furniture, but disposed of it in a way that was not authorized by the trust instrument. Furthermore, Executors overlook the fact that the $150,000 gift was given to Peter from the RFM trust. The RFM trust has nothing to do with the creditor's claims that Peter filed against Robert's probate estate to recover damages caused by Robert's alleged breach of his fiduciary duties as trustee of Trust I.

For all of these reasons, we affirm the probate court's conclusion that Peter has not engaged in conduct that constitutes a contest under the terms of the no-contest clause in Trust I.

## V.

## DISPOSITION

In the December 2014 order, the finding that Peter's proposed petition constituted a contest of Trust I is reversed. The order denying Peter's safe harbor application is otherwise affirmed.

The May 2015 judgment is reversed and this matter is remanded to the probate court with directions to modify its findings in its March 13, 2014 order to the extent they conflict with our conclusions above, and to enter a new judgment denying Executors'

34

petition for a determination that Peter violated the no-contest clauses in Trust I and in Robert's will.

The parties are to bear their own costs on appeal.

 

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
RIVERA, J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PETER L. FUNSTEN,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO BANK, N.A. et al., as Executors,<br><br>     Defendants and Respondents. | A140941<br><br>(San Mateo County<br>Super. Ct. No. PRO 123635) |
| Estate of ROBERT FOLGER MILLER, Deceased.<br><br>GEORGE R. BIANCHI et al., as Executors,<br><br>     Petitioners and Appellants,<br><br>v.<br><br>PETER L. FUNSTEN,<br><br>     Objector and Appellant. | A141853<br><br>(San Mateo County<br>Super. Ct. No. PRO 123216)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The written opinion, which was filed on August 1, 2016, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120(a), for partial publication, and good cause established under rule 8.1105, it is hereby ordered pursuant to rule 8.1110 that the opinion should be published in the Official Reports.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV.C. and IV.D.

IT IS SO ORDERED.


DATED: _____                    _____
                                                 RUVOLO, P. J.

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judges: | Hon. Steven L. Dylina<br>Hon. George A. Miram |
| Counsel for Appellant and Objector: | Aaron, Riechert, Carpol & Riffle, Charles M. Riffle, Melissa R. Karlsten, Matthew R. Owens<br><br>Farella Braun + Martel, Kelly A. Woodruff<br><br>Crist, Biorn, Shepherd & Roskoph, Kristopher W. Biorn |
| Counsel for Respondents and Petitioners: | Reed Smith, Paul D. Fogel<br><br>Anderson Yazdi, Hwang, Minton + Horn, John D. Minton, Steven D. Anderson |

A140941 & A141853, *Funsten v. Wells Fargo Bank*